**STATE of Missouri, Respondent,**

v.

**Michael A. DAVIS, Appellant.**

**Michael Allen DAVIS, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 44132.**

Missouri Court of Appeals, Western District.

Jan. 5, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 1993.

Application to Transfer Denied April 20, 1993.

Anthony C. Cardarella, Asst. Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

BEFORE ULRICH, P.J., and SHANGLER and FENNER, JJ.

SHANGLER, Judge.

This is a consolidated appeal by Michael A. Davis from convictions and sentences of several offenses entered upon jury verdict and from the order denying, after evidentiary hearing, his motion under Rule 29.15 to vacate the convictions and sentences previously imposed.

Davis was convicted as a persistent offender [§ 558.016.3, RSMo 1986], for kidnapping [§ 565.110]; robbery in the second

degree [§ 569.030], tampering in the first degree [§ 569.080.1(2)], unlawful use of a weapon [§ 571.030.1(4)], and armed criminal action [§ 571.015.1]. He was sentenced to 25 years for kidnapping, 25 years for robbery in the second degree, 15 years for tampering, 10 years for unlawful use of a weapon and 35 years for armed criminal action. The sentences were imposed to run consecutively, except that the ten year sentence for unlawful use of a weapon was made to run concurrently with the sentences for kidnapping, robbery in the second degree and tampering in the first degree.

The evidence was that on the evening of June 27, 1989, Ms. W. [the victim], a teacher employed by the Higginsville School District, was attending a school board meeting at the high school. When the meeting ended at about 10:15 that night, she went to her car, a 1984 Mercury Lynx station wagon. She heard a person say, "Excuse me. Hey! Could you help me? I need directions." Then this person asked, "Do you know the Montgomery family, or Montgomery Street?" Ms. W. answered, "No, I don't know," and the next thing she knew there was a man standing next to her holding a knife that was pointed at her throat. The man said, "Get in the car, lady." She identified Davis as that man. She did as she was ordered, and Davis also got into the car, and then called to his accomplice, "Hey, we have got a car. Let's go." Another man, whom she referred to as "Fox", appeared and got into the back seat of the car.

Davis was the driver and Fox was in the middle of the back seat with his head between the two front seats. Davis and Fox took turns driving and for seven hours drove across Missouri in her station wagon, first to Kansas City and then to Springfield. They stopped a number of times, but she was never left alone. Each time they stopped, Ms. W. testified, she "was forced to have sex with them."

The trip ended in Springfield. Davis and Fox were tired and decided to stop at a motel to sleep. When Davis and the victim entered the motel to register, she "felt that

this was the first opportunity [she] had to escape." So, she hit Davis with her purse and started screaming, "Call the police. I have been kidnapped." The desk clerk called the police and watched Davis run out of the motel.

On June 28, 1989, Ms. W. identified Davis from a photographic lineup display. That same day, the victim's vehicle was recovered by the Springfield police. They found a knife between the back seats. She identified the knife as the weapon that Davis had placed to her throat.

On July 7, 1989, Davis was questioned by a Lafayette County deputy sheriff as to his role in the crimes. After being advised of his rights under *Miranda,* Davis gave an eleven page written statement wherein he admitted participation with Fox in the crimes with which he was charged, but claimed that he cooperated with Fox because he feared him. The statement gave the detail of the events from June 25 through June 28, 1989.

Davis stated that on June 26, 1989, he and Fox were at the home of Davis' girlfriend, Beverly Davis, who lives in Independence. The three of them decided to drive to Higginsville, but they were stopped by the police and Davis was taken to jail for driving without a license. After Davis was released, Fox said, "Let's get out of this town," so Davis and Fox stole a Gremlin. Fox, however, "burned the clutch," so they stole another vehicle. They drove around Independence to steal gas when Fox saw two girls walking down the street. They abducted and raped them.

They then returned to Beverly's home and slept until about noon the next day. Then Fox, Davis and Davis' father left to go to Springfield, but stopped in Higginsville to see Davis' mother.

Since Fox and Davis' father were not getting along, they needed their own transportation, so Fox decided to steal a car in Higginsville. There were some cars parked in front of the school and they were attempting to start a van when Ms. W. walked out to her car. Davis pulled out his knife and told her "all we wanted was her car and we wouldn't hurt her." They drove to Kansas City in her vehicle. During the drive they stole $21 from her purse. They drove to Independence and then to Springfield.

In his statement, Davis said that Ms. W. "suggested" that she might do a sexual "favor" for him if he would help her. He said she told him "she just wanted to stay alive," so she performed oral sex on him while he drove. Then, he stopped the car and they had "sex standing up next to the car" and then on the hood. Fox then woke up and they both began having sex with her at the same time. Later, as they drove toward Springfield, Davis and the victim "had sex for 45 minutes to an hour." After they arrived in Springfield, Davis left the victim in the car with Fox, and Fox began having sex with her in the back seat. Davis then suggested that they go to a motel to get some sleep, so they went to the Holiday Inn. When Davis attempted to check in with the victim, she hit him with her purse and started screaming. Davis ran out the front door to the car and drove away with Fox. That evening, they decided to steal another car and leave town. They saw a girl sitting in a car by the entrance to St. John's Hospital, and Davis started talking to her. Davis and Fox then opened the car and grabbed her. Fox tried to start the car, but it would not start. They let the girl go and Davis took off running. He then stole a Ford Mustang, fell asleep in the car, and was awakened by Fox. The next morning they attempted to drive to Kansas City in the stolen Mustang, but the car broke down outside of Springfield. They managed to get the car operating long enough to steal another vehicle, a 1965 GMC pickup. They drove it to Peculiar where the engine blew. They walked from Peculiar to the Research Medical Center in Kansas City where they took a bus back to Beverly's house in Independence. They remained there until July 5, 1989, when they were arrested.

Davis, who admitted to prior convictions for auto theft in 1985 and tampering in 1987, testified at the trial consistently with his written statement to the Lafayette County deputy sheriff. He admitted acting

with Fox in the forcible abduction of Ms. W. and the robbery of her automobile. Davis said that when he first met Fox they talked about ways of making some money. When Davis told him, "I wasn't doing anything illegal," Fox belittled him and threatened him with violence and beat him. Fox relented only after Davis said, "I'll listen." Davis admitted that thereafter he and Fox stole a truck in Independence, abducted the two girls at knifepoint, and that Fox raped one of them. He testified to the events that led up to the abduction of Ms. W. and the theft of her vehicle, already described in his statement. Davis intimated that had he not cooperated with Fox during that escapade of abduction, "the lady [Ms. W.] probably wouldn't have been here today to tell what had happened."

On October 9, 1990, while being transported from a hearing, Davis told the attending officer that Fox was going to testify for Davis that Fox was to blame for all of the crimes that were committed and that Davis should not be blamed for them, and that Davis was to write a letter to Fox stating the same thing for him.

William P. Bellamy, the attorney representing Fox in the criminal charges, received a letter from Fox dated February 23, 1990, addressed to "Ron" [Fox] and signed "Michael Davis." The letter read:

Ron,

Friday, February 23rd, 1990.

I figured I would write to you to tell you how bad I feel about this whole mess. I have been thinking since we first got arrested about what brought us here in the first place. I am really sorry I got you into this mess. I hope you don't get into a bunch of trouble over all this stuff. I know it's all my fault. I was really trippin'. I just wanted us to make some money, and I needed help, but I didn't have anybody to go along with me. That's basically why I threatened you. I just wanted someone to help me, and by threatening to kill you I figured you would go along. I was pretty strung out even before I met you. I don't know what is going to happen to me. You don't deserve prison, and I don't think I do either. I just need help. I hope you don't use this letter against me. I'm writing to you to say how sorry I am. You wouldn't be here if I hadn't threatened to kill you. I guess I wouldn't blame you if you did go against me, but no matter what I am so very sorry for everything. No matter what happens please forgive me.

> Michael Davis.

P.S. Sorry I held the knife to your throat. Hope I didn't hurt ya.

### Point I

The first contention on appeal is that the trial court erred by sustaining the objection of the prosecutor to defense counsel's comments during the voir dire concerning the presumption of innocence principle and describing one of those comments as "incorrect" in the presence of the jury.

In the course of the voir dire, defense counsel undertook to address the veniremembers and this interchange ensued:

MS. TYLER: As Mr. Davis sits here today, he is presumed to be innocent. In other words, prior to hearing any evidence here today you must each think of him as innocent of any crime.

MR. PERRY: Your Honor, I object to that statement. There's a misstatement of the law.

THE COURT: I think your first statement was correct. He is presumed innocent, Ms. Tyler, but your second statement was incorrect.

MS. TYLER: May we approach the bench, Your Honor?

(Counsel approached the bench and the following proceedings were had)

MS. TYLER: What statement?

THE COURT: Wait a minute. Your first statement that he is presumed innocent is no problem at all. That's the Court's instruction to the jury. Your second statement that you must think of him as innocent is not the same statement that you made the first time. So, I'll sustain Mr. Perry's objection. And without making a lot more to-do about this, I suggest you go back and ask another question. Okay? If you want

**39**

to, go back and restate your question you asked first. That was not objected to. And go on after that. That would be fine.

MS. TYLER: That will be fine.

THE COURT: Thank you.

(The proceedings returned to open court.)

MS. TYLER: As Mr. Davis sits here today, he's presumed to be innocent. Does anyone have a problem with the concept of the presumption of innocence?

(No response.)

MS. TYLER: Does everybody here today understand that simply because Mr. Davis is charged with a crime is not evidence of anything? In other words, just because he is charged does not mean he is guilty. Does everybody understand that?

(No response.)

That ended the inquiry on the presumption of innocence.

The sense of the complaint on appeal is that the ruling of the court prevented counsel from determining who, among the veniremembers, would be qualified to serve on the defendant's jury. The defendant argues that "denial by the trial court of a legitimate inquiry concerning a venireperson's's qualifications constitutes reversible error," and cites *State v. Wacaser*, 794 S.W.2d 190 (Mo. banc 1990). The question here is of "legitimate inquiry." It is so, as defendant argues, that he is entitled to a "liberal latitude" in the examination on voir dire in order to discover bias and prejudice of potential jurors. *See State v. Finch*, 746 S.W.2d 607, 613[11] (Mo.App.1988).

■ The examination of veniremembers as to their qualification to serve as impartial jurors, nevertheless, is conducted under the supervision of the trial court, and the nature and extent of the inquiry remains constrained by the discretion of the court. *State v. Smith*, 649 S.W.2d 417, 428[15–17] (Mo. banc 1983). Moreover, the rulings of the trial court during voir dire will be disturbed on appeal only when "the record shows a manifest abuse of discretion and a real probability of injury to the complaining party." *State v.*

*Olinghouse*, 605 S.W.2d 58, 68 (Mo. banc 1980). This record shows neither.

■ Whatever the considerable breadth of counsel's role on voir dire to protect against a biased jury, the exposition of the law to the case is not within that scope. Counsel on voir dire may neither inform the panel of the law applicable to the case or tell what the court's instructions will be. *State v. White*, 722 S.W.2d 92, 94[1] (Mo.App.1986); *State v. Beatty*, 617 S.W.2d 87, 92[10, 11] (Mo.App.1981). The effect of counsel's hortation to the jury, "In other words, prior to hearing any evidence here today you must each think of him [defendant] as innocent of any crime," was exactly that an advisory of law. It was, moreover, a gratuitous and erroneous advisory.

It was gratuitous because the court had already instructed the jury by MAI–Cr3d that, "The defendant is presumed to be innocent unless and until, during your deliberations upon your verdict, you find him guilty." It was erroneous because the presumption does not require a juror to "think of [the defendant] as innocent until the end of the trial." It does not require a subjective belief of the innocence of the defendant. It informs the jury [in the terms of MAI–CR3d], rather, that, "This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty." It is a caution to the jury to put away from their minds all the suspicion that arises from " 'the present situation of the accused' "— the arrest, the formal charge, the arraignment and to judge the accused "solely on the basis of the evidence adduced at trial," and beyond a reasonable doubt. *Taylor v. Kentucky*, 436 U.S. 478, 486–87, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978); *Estelle v. Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976). That is also the substance and sense already imparted to the jury panel by MAI–CR3d.

The trial court properly disallowed the question on voir dire. The trial court gave opportunity to trial counsel to amend the

error and continue the inquiry to conclusion, and she did. The first point is denied.

## Point II

■ The second point contends trial error in yet another phase of the voir dire. The record discloses this interchange:

MS. TYLER: If I told you that under Missouri law a person is not criminally responsible for acts that someone else forces him to commit, would anybody disagree?

VENIREMAN: Would you repeat that, please?

MS. TYLER: I would be happy to, sir. If I told you that under Missouri law a person is not criminally responsible for acts somebody else forces him to commit, would you—

THE COURT: Just one moment. Ms. Tyler, would you approach the bench, please.

. . . . .

THE COURT: Ms. Tyler, I don't know where you are going, but you are starting to instruct the jury on what the Missouri law is.

MS. TYLER: That's my only question, Your Honor.

THE COURT: Just a moment. Only the Court can instruct the panel on what the law is, and you have just done that ...

The colloquy continued, the prosecutor added an objection, and the court advised defense counsel to "go back out and ask another question." She promptly acceded with, "I would be happy to move on, Judge," and the episode ended.

The defendant now complains that the action of the court was an abuse of discretion, that the judge improperly "halt[ed] defense counsel's inquiry concerning the statutorily guaranteed affirmative defense of duress," and thereby "totally stifl[ed]" any inquiry on the issue.

Quite apart from the validity of the question posed as a definition of duress, we have noted that counsel on voir dire may not instruct the panel on the law of the case or tell what the court's instructions will be. *State v. White,* 722 S.W.2d at 94[1]. That was the effect of the question. It was that interference with the trial court function and not, for instance, any legitimate probe as to whether the panel members were willing to consider duress as a defense under the court's instruction, that justified the court's interruption and disallowance of the inquiry. The point is denied.

## Point III

■ The defendant next contends that it was prejudicial error to allow the prosecution to elicit testimony that defendant Davis forcibly raped and sodomized the victim during the course of her abduction and kidnapping or that Davis and Fox had sexually assaulted two other women the day before the victim's abduction because it constituted evidence of uncharged crimes. Indeed, the statement of defendant Davis included not only the rape and sodomy of the victim, but also episodes of the theft, attempted theft and tampering of vehicles, and the attempted kidnapping and assault of a still another girl, all uncharged crimes.

■ It is the rule that evidence that a defendant committed crimes separate and distinct from those for which the defendant is on trial is not admissible unless the evidence bears legitimately to establish the guilt of the defendant of the crime charged. Such evidence is deemed to prove the crime charged "when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or the identity of the person charged with the commission of the crime on trial." *State v. Shaw,* 636 S.W.2d 667, 671–72[4] (Mo. banc 1982). Thus, the evidence that Davis and Fox repeatedly raped and sodomized the victim was admissible to show a common scheme or plan on the part of the two men to kidnap the victim, steal her automobile, and sexually abuse her. That evidence was admissible also to show Davis' motive for kidnapping the victim. *State v. Moore,* 744 S.W.2d 479, 481[4, 5] (Mo.App.1988).

The evidence as to the sexual assaults by Davis and Fox against two girls in Independence the day before was admissible for the same reasons. It demonstrated that Davis and Fox were engaged in that same common scheme or plan over a period of days.

The evidence was also admissible to show that, contrary to the posture of Davis' testimony at trial, his participation in the crimes against Ms. W. and indeed throughout was not coerced.

It was for the trial court to evaluate whether the possible prejudice of the evidence outweighed its relevance as proof of both the crimes charged and to the defense of duress. *State v. Kenley,* 693 S.W.2d 79, 81[2, 3] (Mo. banc 1985). The admission of the evidence was not improper.

The point is denied.

### Point IV

The defendant next contends that the trial court erred in the admission into evidence State's Exhibit No. 2, a letter written by Davis to Fox, on the ground that the letter was without "sufficiently legal foundation and authentication." In that letter, Davis apologized for threatening to kill Fox, and took full responsibility for getting Fox "into this mess." The letter, addressed to "Ron" and purportedly signed by "Michael Davis" had been introduced into evidence at Fox's sentencing hearing by his counsel, William P. Bellamy.

There was evidence, already noted, that while being transported from a hearing, Davis told attending officer Brown that Fox was going to testify for Davis and would say that Fox was the one to blame for all the crimes committed, and that Davis had written a letter to Fox stating the same thing for him. Davis admitted during his trial testimony that State's Exhibit No. 2 was the letter he had sent Fox. Bellamy testified that he was not familiar with Davis' handwriting, so he could not identify the exhibit as in his hand or the signature as his signature. It is the rule that the execution or authenticity of a private writing must be established before it may received as evidence. *Cummins v.*

*Dixon,* 265 S.W.2d 386, 394[7–10] (Mo. 1954). The authenticity of a document cannot be assumed, but what it purports to be must be established by proof. *Heutel v. Stumpf,* 783 S.W.2d 421, 422[2] (Mo.App. 1989). Thus, the fact alone that a letter purports to have been written and signed by the person to whom it is attributed does not establish its authenticity and genuineness. An exception to that rule, the "reply letter doctrine," is that letters received in reply to other letters proved to have been sent to the party are admissible. It rests upon the presumption that "letters are delivered to the person to whom addressed, and that the reply was written by him or by his authority." *Crawford v. Metropolitan Life Ins. Co.,* 167 S.W.2d 915, 923[9] (Mo.App.1943).

Here, Davis admitted upon oath that State's Exhibit No. 2 was the letter that he wrote to Fox. Whatever the theory of the sufficiency or fallibility of foundation for admission of the letter as evidence, therefore, Davis admitted under oath that State's Exhibit No. 2 was the letter that he wrote to Fox, and so cannot complain on appeal that it lacked authenticity as evidence.

The point is denied.

### Point V

The next contention on appeal is that the defendant was subjected to double jeopardy when the trial court sentenced him upon convictions on both Count II [robbery in the second degree] and Count III [tampering in the first degree] and also, separately, when defendant was sentenced upon convictions on both Count IV [unlawful use of a weapon] and Count V [armed criminal action]. In preface, the argument acknowledges that, as here, where convictions are returned and sentences are imposed in a single proceeding, the issue of the validity of the cumulative sentences is solely one of legislative intent. He argues that the punishments imposed on the robbery count and tampering count for "the same act of taking" Ms. W.'s vehicle are cumulative, as are the punishments imposed on the unlaw-

**42** ■ ▬▬▬▬▬▬▬▬▬

ful use of a weapon count and armed criminal action count for exhibiting the knife. These cumulative convictions [and hence punishments], he argues, violate the legislative intent of § 556.041(3), RSMo 1986, and hence subjects him to double jeopardy.

■ It is by now understood as established doctrine that, "in the multiple punishments context" the interest that the Double Jeopardy Clause protects is " 'limited to ensuring that the total punishment did not exceed that authorized by the legislature.' " *Jones v. Thomas*, 491 U.S. 376, 381, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989). The purpose is to ensure that "sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Id.; see also, State v. McTush*, 827 S.W.2d 184, 196[2, 3] (Mo. banc 1992). Thus, where a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those statutes proscribe the "same conduct", the prosecution may seek and the court may impose cumulative punishment under those statutes in a single proceeding without offense to the double jeopardy clause. *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983); *State v. McTush*, 827 S.W.2d at 186[2, 3].

To determine whether the legislature intended multiple punishments for the "same conduct," we look first to the statutes under which the defendant was convicted. *State v. McTush*, 827 S.W.2d at 187[4]; *State v. Villa–Perez*, 835 S.W.2d 897 (Mo. 1992). If these statutes do not indicate whether the legislature intended to punish cumulatively under each of the enactments, then there is resort to § 556.041, RSMo 1986, our general cumulative punishment statute.[1] *State v. McTush*, 827 S.W.2d at 187[4]; *State v. Villa–Perez*, 835 S.W.2d 897 (Mo.1992).

■ The robbery conviction was returned under Count II of the information undertook to charge robbery in the second

degree under § 569.030, RSMo 1986, that Davis "forcibly stole a 1984 Mercury Lynx station wagon owned or possessed by [Ms. W.]" in the course of which he "used or threatened the immediate use of a dangerous instrument against [Ms. W.]" The tampering conviction was returned under Count III of the information which charged in terms of tampering in the first degree § 569.080.1(2), RSMo 1986, that Davis "knowingly and without the consent of the owner, operated a motor vehicle, to-wit [a] 1984 Mercury Lynx station wagon." These statutes do not say whether the intention is to punish the conduct they proscribe cumulatively.

The defendant argues that it is manifest nevertheless from subsection (3) of § 556.041 that the conviction and punishment for *both* robbery in the second degree and tampering in the first degree from *the same conduct* "falls within the statutory limitation on conviction for multiple offenses," and so unlawfully subjected him twice to punishment for the same offense. In the context of § 556.041, subsection (3) provides:

> When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if
>
> . . . .
>
> (3) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct;
>
> . . .

Davis develops the argument that under subsection (3) he should not have been convicted of both offenses because "the two offenses differed *only* in that one [robbery in the second degree] is defined to prohibit a designated kind of conduct generally and the other [tampering in the first degree] is defined to prohibit a specific instance of such conduct." [original emphasis]. To sustain the argument, Davis cites the Comment to 1973 Proposed Code, § 556.041, that illustrates the general proposition of

---

1. *See* Appendix A.

the statute, "that the state may prosecute and convict for separate offenses even though they arise out of the same conduct," ought not apply under subsection (3). The Comment continues, "A person ought not be convicted of *both* reckless driving and running a stop sign for the same act of running the stop sign." [original emphasis.]

The illustration the Comment poses to infuse the meaning of subsection (3) is valid. Its use as an analogy to the convictions, and hence punishments, for robbery in the second degree and tampering in the first degree, is not. That is because the offenses are not established by the same kind of conduct.

A person commits the crime of robbery in the second degree if the person forcibly steals property. § 569.030, RSMo 1986. A person *forcibly steals* if in the course of stealing, the person uses or threatens the immediate use of physical force upon another person for the purpose of preventing or overcoming resistance to the taking of the property or to its retention or compelling the owner of the property to deliver up the property. § 569.010, RSMo 1986; MAI–CR3d 323.04. The purpose component of the offense was submitted in terms of paragraph Second [3]: for the purpose of "using or disposing of it in such a way that made recovery of [the vehicle] by the owner unlikely."[2]

A person commits the crime of tampering in the first degree under § 569.080.1(2) if that person "knowingly receives, possesses, sells, alters, defaces, destroys or *unlawfully operates an automobile ...* without the consent of the owner thereof." [emphasis added.]; *State v. Barnett,* 767 S.W.2d 38, 40 (Mo. banc 1989). The offense was submitted under MAI–CR3d in terms of knowingly operating the automobile owned by Ms. W. without the consent

of the owner. The verdict was returned on that theory and the punishment imposed on the conviction for that conduct.

It is apparent that the conduct that established the offenses of robbery in the second degree and tampering in the first degree was not the "same conduct" within § 556.041. Nor, as Davis argues, do the offenses differ only in that robbery in the second degree is defined to prohibit a "designated kind of conduct generally" and the other, tampering in the first degree, as a "specific instance" of such kind of conduct, and so not punishable cumulatively under subsection (3) of § 556.041. The convictions are not for the "same act of taking" the Ms. W. station wagon, as Davis argues. The "taking" under the definition of robbery in the second degree § 569.030 occurs when the offender wrongfully assumes complete dominion over the property. *Byrd v. State,* 726 S.W.2d 402, 403[1, 2] (Mo.App.1987). That "taking" was accomplished when Ms. W. yielded the possession of the vehicle to Davis under the threat of physical force. The "taking," under the definition of tampering in the first degree § 569.080.1(2) charged against Davis, occurs when the offender wrongfully operates the automobile without the consent of the owner. That "taking" was accomplished when Davis began to operate the automobile without the consent of the owner Ms. W. Thus, under the definitions of the statutes and the evidence that proved them, the "taking" in each case was of a different kind and at a different time. The "taking" in the robbery ended before the "taking" in the tampering began.

Although the crime of robbery is not complete until there is some asportation of the property, "asportation" occurs when the property taken has been moved, however slightly. *State v. Bradshaw,* 766 S.W.2d 470, 472[1] (Mo.App.1989). The

---

**2.** Count II of the information, as noted, charges that Davis forcibly stole the vehicle owned or possessed by Ms. W. and "used or threatened the immediate use of a dangerous instrument against [the victim]." The aggravating factor of the use or threat of "immediate use of a dangerous instrument against any person" enhances the crime to robbery in the first degree. *See*

§ 569.020.1(3). Although Count II of the information undertook to charge robbery in the second degree, but in legal effect charged robbery in the first degree, the submission of Count II to the jury was in terms of robbery in the second degree, and the conviction rests on that submission, and the punishment on that conviction.

movement of the motor vehicle that constituted tampering by the definition of offense charged, was the operation of the motor vehicle. The term "operation" as used in § 569.080.1(2) is not defined by statute. It has been understood by judicial opinion to include the act of "driving." *State v. Greer,* 783 S.W.2d 527 (Mo.App. 1990); *State v. McIntyre,* 735 S.W.2d 111 (Mo.App.1987). That was the nature of the submission and of the proof of tampering upon which the conviction and sentence of the offense rest. The asportation for robbery and driving for tampering was at most a fleeting coincidence of "same conduct" and without significance to either subsection (3) of § 556.041 or the rule of double jeopardy. There was no impediment to the lawful cumulative punishments for convictions of robbery in the second degree and tampering.

■ The defendant argues also that the cumulative punishments entered upon convictions for unlawful use of a weapon under Count IV and armed criminal action under Count V violate the legislative intent of § 556.041(3) and hence subject him to double jeopardy. The argument cites *State v. King,* 748 S.W.2d 47 (Mo.App.1988). In *King,* the defendant was convicted of unlawful use of a weapon and armed criminal action and was sentenced cumulatively. The armed criminal action charge used the unlawful use of a weapon crime as the underlying offense. The armed criminal action statute, § 571.015.4, RSMo 1986, provided that the terms of that section "shall not apply to the felonies defined in [among others] § 564.610" [now § 571.030] unlawful use of weapons. *King* determined that both the armed criminal action and unlawful use of a weapon convictions were based upon the "same conduct," the exhibition of a knife. Since armed criminal action § 571.015.4 expressly excluded from its application offenses described in unlawful use of weapons § 571.030, multiple punishments for the same conduct were not intended by the legislature, and so the cu-

mulative sentences placed the defendant in double jeopardy. *Id.* at 50[4, 5].

■ Where, however, the armed criminal action conviction rests on some offense other than the unlawful use of a weapon, conviction and punishment in the same trial of both armed criminal action and the unlawful use of a weapon for the same conduct does not offend general cumulative punishment § 556.041 or the principle of double jeopardy. *State v. McKee,* 826 S.W.2d 26, 29 (Mo.App.1992); *State v. Gottsman,* 796 S.W.2d 27, 30 n. 5 (Mo.App. 1990). Here, the predicate offense for the armed criminal action was tampering Count III, and not unlawful use of a weapon Count IV. Thus, the convictions and punishments for both armed criminal action and the unlawful use of a weapon did not place Davis in double jeopardy or violate § 556.041.

The point is denied.

## Point VI

The final point contends that the order of the motion court denying post-conviction relief was clearly erroneous and should be reversed. Rule 29.15(j). The motion contended that defendant's trial counsel was ineffective in failing to take the deposition of the victim of the offenses, Ms. W., although requested to do so by the defendant. Counsel explained at the hearing on the Rule 29.15 motion that she did not take the deposition of the victim because it was not necessary. She already had the transcript testimony of Ms. W. on the preliminary hearing and also the statement the victim gave to the police. The Davis motion contends nevertheless that given the nature of the prosecution evidence and the defense theory of duress, "it was more imperative that [Davis'] trial counsel attempt to fully investigate, contact or depose *any* witness known to her through either the defendant's requests or police reports." [3] The complaint on this appeal, however, is that trial counsel was ineffective by failure to take the deposition of the

---

3. The argument refers to *Jackson v. State,* 537 S.W.2d 211 (Mo.App.1976), but does not say how that decision supports the thesis of the

argument. A reading of the case itself is no more informative.

victim, and not by failure to investigate or depose *any* witness.

 Appellate review of the order sustaining or overruling a Rule 29.15 order is limited to the determination of whether the findings and conclusions of the trial court are clearly erroneous. *Leisure v. State*, 828 S.W.2d 872, 874 (Mo. banc 1992). Findings and conclusions are clearly erroneous under Rule 29.15(j) only if upon a review of the entire record the court is left with definite and firm conviction that a mistake has been made. *State v. Schaal*, 806 S.W.2d 659, 667[16] (Mo. banc 1991). In that assessment the appeals court gives deference to the opportunity of the motion court to judge the credibility of the witnesses. *State v. Twenter*, 818 S.W.2d 628, 635[8, 9] (Mo. banc 1991).

 The burden is on the movant to prove the grounds for relief by a preponderance of the evidence. Rule 29.15(h). In order to prove ineffective assistance of counsel, the movant must show that the performance of counsel was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2864, 80 L.Ed.2d 674 (1984). "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* To prove ineffective assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Movant must also overcome the presumption that counsel's challenged acts or omissions were sound trial strategy. *State v. Stepter*, 794 S.W.2d 649, 656[16, 17] (Mo. banc 1990). Counsel's decision as to whether to depose a witness is generally a matter of trial strategy. *Ruff v. State*, 815 S.W.2d 460, 464[7] (Mo.App.1991).

Prejudice is shown by proof that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068; *State v. Stepter*, 794 S.W.2d at 656[18]. That prejudice must be affirmatively proved. *State v. Stepter*, 794 S.W.2d at 656[18]. There is

a "strong presumption" that counsel made all significant decisions in the exercise of her reasonable "professional judgment." *Id.* at 657[19]. That presumption attends choices of strategy as well. *Id.*

 Davis fails to show, or even to articulate, prejudice. Davis does not explain how a deposition of the victim, whose testimony concerning the events was already available to him and whose statement to the police is known to him, would have changed the result. It is not enough to argue, as does Davis, that because as trial defense counsel conceded, a deposition "could have been beneficial" to the defense, prejudice is proven. The question is, rather, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. at 695, 104 S.Ct. at 2068; *Hamilton v. State*, 770 S.W.2d 346, 348[5] (Mo.App.1989). There is no basis in the record for such a probability.

The motion court expressly found and concluded:

> The Movant's claim set forth … in his pro se Motion alleges counsel's failure to depose victim [Ms. W.] prior to trial … The Court finds that counsel Kimberly Tyler's action in this regard amounted to trial strategy. Ms. Tyler testified in this cause that she had the benefit of a transcript of the preliminary hearing wherein [the victim] testified and also a copy of [Ms. W.'s] statement to police. Movant failed to prove what, if any, specific testimony other than previously elicited from [the victim], that would have been forthcoming. Movant's said claim thus does not state a basis for relief.

The finding rests on substantial evidence and is not clearly erroneous.

The judgments of conviction are affirmed. The order denying post-conviction relief is affirmed.

All concur.

APPENDIX A

**§ 556.041, RSMo 1986 Limitation on conviction for multiple offenses**

When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if

(1) One offense is included in the other, as defined in section 556.046; or

(2) Inconsistent findings of fact are required to establish the commission of the offenses; or

(3) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or

(4) The offense is defined as a continuing course of conduct and the person's course of conduct was uninterrupted, unless the law provides that specific periods of such conduct constitute separate offenses.