STATE of Missouri, Plaintiff–
Respondent,

v.

James R. CRAVENS, Defendant–
Appellant.

No. 25142.

Missouri Court of Appeals,
Southern District,
Division Two.

May 6, 2004.

Amy M. Bartholow, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane Dixon Crouse, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Judge.

By amended information, James Cravens ("Defendant") was charged with the offenses of murder in the second degree and armed criminal action for killing Deborah Roy ("Victim") with a sawed-off shotgun. *See* § 565.021.1; § 571.015.[1] A jury found Defendant guilty of each offense and recommended sentences of 18 years imprisonment on the second degree murder count and seven years imprisonment on the armed criminal action count. The trial court followed the jury's recommendation when entering judgment and sentenced Defendant to serve the aforementioned terms of imprisonment consecutively.

Defendant appeals, presenting two points of error. In Point I, Defendant claims the trial court erred in admitting the written statements of three witnesses as prior inconsistent statements pursuant to § 491.074 because the State failed to lay a proper foundation for such use. In Point II, Defendant claims the trial court erred in excluding from evidence an address book containing an entry in which the writer expressed a desire to die from a fatal disease. We affirm.

■ Defendant does not challenge the sufficiency of the evidence to sustain his conviction for second degree murder and armed criminal action. In this appeal, we consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences. *State v. Campbell*, 122 S.W.3d 736, 737 (Mo.App. 2004); *State v. Rush*, 949 S.W.2d 251, 252 (Mo.App.1997). Viewed from that perspective, the favorable evidence supporting the State's case against Defendant is set out below.

In 1996, Defendant lived with Victim in her trailer house on County Road 2010 near West Plains, Missouri. Their nearest neighbors were the Baumgardners, who lived in another trailer house across the road. Three Baumgardner children—LaDella, Jonathan and Jessica—resided in this trailer house, along with their father and grandmother.[2]

On June 19, 1996, Jonathan awakened to hear Defendant and Victim arguing. They continued doing so throughout the day. The Baumgardner family had planned to have a barbecue on the evening of the 19th. Shoynna Klingler, who was dating the Baumgardner children's father, was at their residence because she had been invited to attend the meal.

At about 6:00 p.m., Shoynna, LaDella, Jonathan and Jessica walked up the road to gather fruit from a nearby raspberry patch. While the group was walking, they saw Defendant and Victim standing inside the doorway of Victim's trailer, still arguing with one another. Jonathan and Jessica observed Defendant push Victim and throw her around. The argument between Defendant and Victim continued while Shoynna and the Baumgardner children picked raspberries for about 30 minutes. As the group returned to the Baumgardner trailer, they heard Defendant tell Victim, "[I]f you don't do what I say, you will be sorry."

The argument between Defendant and Victim continued throughout the evening while the Baumgardners were having their barbecue. At approximately 10:00 p.m., Jonathan went outside to clean out his father's automobile. Shoynna also came outside to help with the task. Defendant

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. In our opinion, we will refer to witnesses individually by their first names. We do so for purposes of clarity and intend no disrespect.

and Victim were still arguing. At approximately 10:30 p.m., Jonathan and Shoynna heard Victim scream like she was scared and say, "No, no, please don't...." Victim's words were followed by a loud gunshot. After the shot occurred, Defendant closed the door to Victim's trailer, walked around inside for a short time, turned out the lights and left. While Defendant was outside the trailer, Jonathan heard a noise like that made by someone spinning a cylinder in a gun.

During the late evening hours of June 19th, Texas County Sheriff's Deputy Jerald Sigman was on patrol when he saw Defendant's vehicle headed northbound on Highway 181. At 12:45 a.m. on June 20th, Deputy Sigman observed Defendant's vehicle a second time. This time, the truck was in a business parking lot at the junction of Highway 63 and U Highway. The truck was parked with its headlights still on. Deputy Sigman turned around and went back by the vehicle, which now had its headlights turned off. Since Deputy Sigman could now see someone outside the truck, he pulled into the lot to see who the person was and what he was doing. As Deputy Sigman approached Defendant's truck, he observed a box of Natural Light beer in the truck, and he could smell intoxicants. Deputy Sigman asked Defendant what he was doing there, but received no answer. When the officer requested Defendant's identification, he responded with an expletive and sped away in his truck.

Deputy Sigman pursued Defendant, who was traveling at a high rate of speed on U Highway. At Deputy Sigman's request, two law enforcement officers from the Cabool Police Department attempted to stop Defendant by parking their police cars at the intersection of Highways U and 63 and activating their emergency lights. Defendant initially slowed as he approached the intersection, but then he accelerated and continued onward. One of the officers from Cabool shot out the left front tire of Defendant's vehicle as it approached because the officer was afraid of being run over by Defendant. The pursuit continued as Defendant turned north onto Highway 63 and then east onto Orchard Road. Defendant finally stopped after traveling a short distance on Berry Road.

Once stopped, Defendant refused to leave his vehicle and only complied after being ordered to do so at gunpoint several times. When he exited his truck, he was wearing an empty shoulder holster and an empty side holster. Defendant also had a loaded 9 mm magazine, a loaded .22 magazine, an empty cylinder for a .22 revolver, and individual rounds of 9 mm and .22 ammunition. In addition, Defendant had six yellow Winchester 20 gauge shotgun shells in his possession. When Defendant was asked where his weapons were, he replied that it was not against the law to possess ammunition. Defendant was taken to jail at the Texas County Sheriff's Department. While Deputy Sigman was patting Defendant down, Sigman saw red spots on Defendant's pants.

When the Baumgardners got up on the morning of June 20th, they noticed that the door to Victim's trailer was padlocked shut from the outside, all of the windows were closed, the outside light was still on, and one of Victim's dogs was outside. Because this was unusual, they called the police. A deputy from the Howell County Sheriff's Department arrived at 1:30 p.m. and discovered Victim's body lying on a sofa bed inside the trailer. She had been shot in the face with a shotgun. A partial box of yellow Winchester 20 gauge shotgun shells was found on a kitchen counter inside the trailer. These shotgun shells were the same brand and type of shells recovered from the Defendant by the Texas County Sheriff's Department. The

forearm of a shotgun was found outside in the yard.

During the evening hours of June 20th, the Texas County Sheriff's Department conducted a search for evidence along U Highway, Orchard Road and Berry Road, which were roads taken by Defendant during his attempt to escape from police earlier that morning. While searching Orchard Road, a deputy found a single shot 20 gauge shotgun that was missing its forearm. A spent shell was found inside the chamber. The stock and barrel of the weapon had been sawed off to shorten it, resulting in a gun with an overall length of 21½ inches and a barrel length of 13 5/8 inches. The trigger guard on the gun was missing. The forearm found at Victim's trailer had come from this shotgun. The shotgun, forearm and spent shell were tested later for latent prints by an examiner at the Missouri Highway Patrol crime lab. No fingerprints were found on any of the items.

After Victim's body was discovered, two Highway Patrol officers interviewed Defendant at the Texas County jail at three different times over a six-hour period. During the first interview, Defendant was evasive in responding to questions. He admitted arguing with Victim, but claimed he left their residence and spent the day with his cousin and stepmother. Defendant said nothing about Victim being dead and denied knowing where she was. During the second interview, Defendant denied owning a shotgun. He explained the presence of shotgun shells in his truck by claiming that he intended to buy a shotgun to deal with troublesome neighborhood pets that were getting into his trash. He did admit, however, that he had thrown guns out of his vehicle while he was being

pursued by police in Texas County. After a break, Defendant then admitted that he had killed Victim, gotten scared and ran. He conceded that his responses to the investigators' earlier questions had been lies. During a third taped interview, Defendant again admitted killing Victim and owning the shotgun involved in the shooting.[3]

At the trial, the State presented expert testimony from Dr. Douglas Anderson, a pathologist who performed an autopsy on Victim. Dr. Anderson testified that Victim died from a massive shotgun wound to the face. She had no diseases at the time of her death. The shotgun pellets entered beneath the bridge of Victim's nose and angled slightly upward and toward the back of the skull, causing a wound that was about 4½ inches in diameter. Victim's right eye, cheekbone and ear were destroyed by the fatal shot, which was fired from a distance of greater than four or five feet.

After Defendant was convicted and sentenced, he appealed. Additional facts are provided below when relevant to our discussion of Defendant's two points relied on.

Defendant's first point concerns the trial court's admission of Exhibits 2, 4 and 6 into evidence. These three exhibits were the written statements that LaDella, Jessica and Jonathan, respectively, had provided to police officers during the investigation of Victim's death. During each witness' direct examination, the State offered that person's written statement as a prior inconsistent statement that was admissible as substantive evidence pursuant to § 491.074. Defendant argues that the trial court erred in admitting the exhibits

**3.** In this last interview, Defendant acknowledged that he killed Victim, but denied that he meant to do so. Defendant said Victim was trying to commit suicide, and she was killed when Defendant attempted to take the gun away from her.

on this basis because the State failed to lay a proper foundation.

■ We begin our analysis by examining the language of § 491.074, which states:

Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement.

*Id.* The Legislature's passage of this statute in 1985 abrogated the traditional common law rule that a party could not impeach his own witness with a prior inconsistent statement, absent a showing of surprise or hostility. *See State v. Phillips,* 940 S.W.2d 512, 520 (Mo. banc 1997); *State v. Kellner,* 103 S.W.3d 363, 366 (Mo.App.2003). In *State v. Bowman,* 741 S.W.2d 10 (Mo. banc 1987), our Supreme Court held that there are only two foundational requirements necessary for admission of a prior inconsistent statement pursuant to § 491.074:

Inconsistent statements are available as substantive evidence, and may be used just as soon as the inconsistency appears from the testimony. The only necessary foundation is the inquiry as to whether the witness made the statement, and whether the statement is true. Any requirement of additional foundation would dilute the effect of the statute.

*Id.* at 14 (footnote omitted). *See also State v. Lyons,* 951 S.W.2d 584, 594 (Mo. banc 1997). Thus, "after enactment of § 491.074 and the *Bowman* decision, the prior inconsistent statement is independently admissible substantive evidence once the inconsistency is established." *State v. Blankenship,* 830 S.W.2d 1, 11 (Mo. banc 1992). "Whether an inconsistency exists between trial testimony and statements made prior to trial is to be determined by the whole impression and effect of what has been said and done." *Id.* at 9; *see also State v. Hicklin,* 969 S.W.2d 303, 309 (Mo.App.1998). We review the trial court's admission of Exhibits 2, 4 and 6 according to these standards.

■ LaDella was the first witness to testify at the trial, which took place approximately six years after Victim's death. LaDella was 16 years old when Victim died and 21 at the time of trial. Before Exhibit 2 was admitted, the prosecutor elicited testimony from LaDella that: (1) she really did not remember a lot of what happened on June 19, 1996; (2) she recalled Defendant and Victim fighting, but she really did not remember what was being said; (3) after she went inside the house after the barbecue, all she remembered was a lot of arguing; (4) Exhibit 2 is a statement she gave to the sheriff's department; (5) she wrote the statement as soon as the officers came and interviewed her about the incident; and (6) her statement contained more details about what happened than she could remember now. Over Defendant's objection, the trial court admitted Exhibit 2 and permitted LaDella to read it to the jury. Exhibit 2 states:

Yesterday evening, about 6:00 p.m., me and my—most of my family walked up the hill to pick raspberries, and [Victim] and [Defendant] was fighting. When we walked back down the hill to go home, they were still fighting. I heard [Defendant] tell [Victim] that she would do as he says or she would be sorry. Last night, about 10:00 p.m., I was in the kitchen and I heard [Victim] screaming and saying something, but I didn't understand what she said. Then I heard a gun being shot, so I ran outside to see what was going on and I seen [Defendant] shutting the doors of [Victim's] trailer. Then all I seen was [Defendant]

walking through the house, and everything got quiet. When I got up this morning, the white truck with a white camper on it was gone.

Based on the whole impression and effect of what LaDella said, an inconsistency does exist between her trial testimony and Exhibit 2 because the exhibit contains important factual information that LaDella was not able to recall and relate at the trial. Measured against *Bowman*, the State's foundation was sufficient for the trial court to reasonably conclude that LaDella made the statements contained in Exhibit 2 and that the statements were true.

■ Jessica was the second witness to testify at the trial. She was 10 years old when Victim died and 17 at the time of trial. Before Exhibit 4 was admitted, the prosecutor attempted to question Jessica about what happened on June 19, 1996, but obtained no useful information due to her lack of memory. The prosecutor then elicited testimony from Jessica that: (1) she had been contacted by law enforcement officers within 24 hours after Victim's death and gave them a written statement; (2) the statement contained what Jessica observed on June 19th; and (3) her statement was truthful. This exchange then occurred:

Q. Do you remember anything in particular at all that day?

A. I hardly remember anything about that day.

At that point, the prosecutor offered Exhibit 4, which the trial court admitted over Defendant's objection. Exhibit 4 states:

I was at my home and I was walking up the road and [Defendant] said, "If you don't do what I say, you will be sorry."

When I was walking home, I seen him pushing her around, and then after supper I heard them arguing and then heard the gun.

Once again, based on the whole impression and effect of what Jessica said, there is a patent inconsistency between her trial testimony and Exhibit 4. Ample foundation existed for the trial court to reasonably conclude that Jessica made the statements contained in Exhibit 4 and that the statements were true.

■ Jonathan was the third witness to testify. He remembered considerably more about what happened on June 19th than LaDella or Jessica, but he was unable to recall at trial whether Defendant made any threats against Victim that day.[4] The prosecutor attempted to elicit this important testimony, but was thwarted by Jonathan's lack of memory:

Q. Now, I'm going to ask you a couple of different things. First of all, when you were walking to the raspberry patch, or coming back from the raspberry patch, do you remember anything specifically being said by either [Defendant] or [Victim]?

A. Not that I can remember.

After this exchange occurred, Exhibit 6 still was not offered until the State had established the following additional facts through Jonathan's testimony: (1) he had made a statement to the Howell County Sheriff's Department the day after Victim died; (2) in the statement, he wrote down everything he saw and heard on June 19th; and (3) his memory of what happened was better when he prepared his statement. The trial court admitted Exhibit 6 over Defendant's objection. The exhibit states:

4. Jonathan's age at the time of Victim's death is not shown by the record, but we infer from the content of his trial testimony and the information included in his statement to the police that he was several years older than Jessica.

I was at home, about 6:00, and all of us went up the road to pick raspberries, and [Victim] and [Defendant] was fighting. He told her that she would do what he told her to do or she would be sorry, and he threw her around. We went in and ate, and me and my dad's girlfriend, Shoynna Klingler, came outside about 10:00 and cleaned the car. I heard [Victim] scream, "No, no, please don't," and I heard a gun fire. Then I could hear him spinning the cylinder. Then I seen some movement. Then the door closed and the lights went out, and I couldn't hear anything else. This happened Wednesday evening, June 19th.

As before, there is a patent inconsistency between Jonathan's trial testimony and Exhibit 6, which contains specific details about Defendant threatening Victim before she was killed. Jonathan was not able to testify about this important factual detail from memory at the trial. The State's foundation was sufficient for the trial court to reasonably conclude that Jonathan made the statements contained in Exhibit 6 and that they were true.

 In urging us to conclude that the trial court's admission of the foregoing exhibits was error, Defendant makes no attempt to demonstrate how or why the State's foundational evidence was deficient under the standard set forth in *Bowman.* Instead, Defendant makes the novel argument that Exhibits 2, 4 and 6 were not admissible pursuant to § 491.074 simply because each of the witnesses acknowledged in their trial testimony that they had made prior statements to the police.[5]

Defendant bases his argument on quotations taken from two cases. "If a witness

professes not to remember if a prior statement was made or not made, a proper foundation has been laid to admit the prior inconsistent statement." *State v. Archuleta,* 955 S.W.2d 12, 16 (Mo.App.1997). "It is unequivocal admission of the prior statement which bars its use." *State v. Jones,* 652 S.W.2d 880, 882 (Mo.App.1983). Defendant appears to be arguing that the phrase, "prior statement," as used in these cases, is simply a reference to the *fact* that the witness has made a statement to someone, rather than to the *substance* of what the witness has said in his statement. Based on this unusual premise, Defendant extrapolates two yin and yang principles that determine the admissibility of a prior inconsistent statement pursuant to § 491.074: (1) if a witness testifies at trial that he cannot recall giving the police a statement about an event, the statement is admissible; but (2) if a witness testifies at trial that he recalls giving the police a statement about an event, the statement is inadmissible. We believe Defendant's argument results from a misunderstanding of the precedents upon which he relies.

In *Archuleta,* police responded to a domestic disturbance call. Upon arrival, the officer found the victim, Ms. Calcote, in hysterics with a swollen eye and blood on her hands. Calcote told the officer that, following an argument, Archuleta had struck her stomach and face several times with his fist and caused her nose to bleed. Archuleta was arrested and charged with third degree assault. At trial, Calcote was asked numerous questions about the details of what had happened on the evening she was assaulted. Her only response was that she did not recall what had taken

---

5. We believe our understanding of Defendant's argument is correct, based on the following statement in his brief: "In Mr. Cravens' case, none of the three witnesses equivocated. All three witnesses unequivo-

cally stated that they had, indeed, made prior police statements. Therefore, the State should not have been allowed to introduce these statements as substantive evidence under Section 491.074."

place. Thereafter, the trial court permitted the prosecutor to elicit testimony from the investigating officer, over Defendant Archuleta's objection, concerning the statements that Calcote had made at the scene. *Archuleta*, 955 S.W.2d at 14. On appeal, Archuleta argued that the trial court erred in permitting the officer to recite Calcote's out-of-court statements as prior inconsistent statements pursuant to § 491.074. The Western District rejected this argument in the following passage from the opinion:

> Section 491.074 sets forth the hearsay exception for prior inconsistent statements if proper foundation is first laid. § 491.074, RSMo, 1996; *State v. Hawkins*, 690 S.W.2d 198, 200 (Mo.App. 1985). "If a witness professes not to remember if a prior statement was made or not made, a proper foundation has been laid to admit the prior inconsistent statement." *State v. Jones*, 652 S.W.2d 880, 882 (Mo.App.1983). Ms. Calcote testified on direct that she did not recall the events of October 2, 1996, including her statements to Officer Keisling. *Her lack of memory to the events of October 2, 1996, established the requisite foundation for the admission of her prior inconsistent statements to Officer Keisling. Because her statements to Officer Keisling qualified as prior inconsistent statements due to her inability to recall the events of October 2, 1996, the statements were admissible under the section 491.074 exception for prior inconsistent statements.* The admission of Officer Keisling's testimony as to Ms. Calcote's statements to him on the night of the assault, therefore, was proper.

*Archuleta*, 955 S.W.2d at 16 (emphasis added). Though the foregoing quotation contains the sentence upon which Defendant relies, we conclude that it was Calcote's inability to recall the events of the assault—not her inability to recall giving a statement to the police—which provided the necessary foundation for the admission of her prior inconsistent statements to the officer. Therefore, *Archuleta* does not support Defendant's argument.

*Jones* is no more helpful to Defendant. In that case, Jones was charged with burglary and stealing after a residential break-in. A number of items had been stolen from the home. Officer Williams stopped a car being driven by Jones. Arthur Oliver was a passenger in the car. The stolen goods were in the back of the vehicle. At a suppression hearing, Williams testified that Oliver said he owned the items in the car. At the trial, however, Williams testified that Oliver had denied ownership of the items and claimed to know nothing about them. *Jones*, 652 S.W.2d at 881–82. Defense counsel sought to lay a foundation for impeachment by asking Williams if he had testified at the suppression hearing that Oliver claimed to be the owner of the stolen items. Williams first said he did not recall, then said it was possible he had made such a statement, and finally denied making this statement. When defense counsel later called the court reporter from the suppression hearing to prove what Williams had said, the trial court sustained the State's objection to the impeachment. The court decided Williams could not be impeached because, in his trial testimony, he did not unequivocally deny making the inconsistent statement about Oliver at the suppression hearing. The Western District held that the trial court's ruling was erroneous:

> The court was in error in ruling that unequivocal denial of a prior inconsistent statement is a requisite prelude to introduction of the prior statement. It is unequivocal admission of the prior statement that bars its use. When a witness equivocates about a prior statement, it may be shown that he made a previous

inconsistent statement. Thus, if a witness professes not to remember if a prior statement was or was not made, a proper foundation has been laid to admit the prior inconsistent statement. *Here, the foundation was laid when Officer Williams expressed uncertainty as to what his testimony had been at the suppression hearing concerning the claim by Oliver to ownership of the property.* *Id.* at 882–83 (citation omitted; emphasis added). Once again, *Jones* contains the two sentences upon which Defendant relies. Viewed in their proper context, however, these statements simply do not support Defendant's argument. First, *Jones* was decided before § 491.074 was adopted, so we fail to understand the relevance of this case in determining how to interpret and apply the statute. Second, the references in *Jones* to Williams' "prior statement" concern the substance of what he said—at the trial and at the suppression hearing—about whether Oliver claimed to own the stolen goods. We reject Defendant's assertion that this phrase was intended only as a generic reference to whether Williams had previously made any type of statement concerning the alleged crime.[6] Accordingly, *Jones* does not support Defendant's argument.

We hold that the foundation laid by the State was sufficient to justify the admission of Exhibits 2, 4 and 6 as substantive evidence pursuant to § 491.074. Therefore, the trial court did not err in overruling Defendant's objections to these exhibits. Defendant's first point is denied.

■ In Defendant's second point, he contends that the trial court erred in excluding Exhibit BBB, which was a green and tan address book discovered in Victim's trailer. This address book, which contained both addresses and some written entries, was found on a table in the Victim's living room while the trailer was being searched by the Howell County Sheriff's Department on June 20, 1996. It was recorded in the evidence log by Corporal Gene Glisson.

During Corporal Glisson's cross-examination, he was questioned about the address book by defense counsel Donna Anthony. Glisson testified that he did not try to determine who the author of the address book was or contact any of the persons whose addresses were listed inside. The first time he reviewed any of the written entries inside the address book was at his deposition, when defense counsel showed him one particular entry. Glisson was then asked the following question:

Q. And after you looked at some of the journal entries, in particular the—the one, you indicated that there were some further things that you wished had been done in the case, didn't you?

Prosecutor Elizabeth Bock objected to this question based on lack of foundation. During the ensuing bench conference, Ms. Anthony said the address book contained an entry stating, "the doctor said I have TB and too bad it's not fatal."[7] She wanted to inquire whether Glisson would have wanted to obtain Victim's mental health records and medical health records if he had seen the entry. The trial court sustained the State's objection, ruling that Glisson's opinion about the journal entry was irrelevant. Defense counsel asked for an opportunity to make an offer of proof.

---

6. If that were the case, Williams' prior inconsistent statement would have been inadmissible since he unequivocally acknowledged during the trial that he had testified at the earlier suppression hearing.

7. This entry apparently was made in October 1995, some eight months before the Victim was killed.

During the offer of proof, the address book was marked as Defendant's Exhibit BBB. Glisson testified that the address book did contain an entry in which the author referred to having tuberculosis and being told it wasn't fatal. Glisson also said that he would have looked into Victim's mental health records and health records if the situation warranted it. As far as Glisson knew, no one had attempted to find out if the address book was written in Victim's handwriting. Based upon that foundational evidence, defense counsel offered Exhibit BBB into evidence. The State objected to its admission because the address book had not been authenticated as something written by the Victim. The following colloquy then took place among the trial court, defense counsel and the prosecution:

> MS. ANTHONY: I haven't offered it for the proof of what's in the writing. What I've offered it for is, if this—if this officer looked at it, there's additional work that should have been done.
>
> THE COURT: Okay. You want to offer it to show that there's an entry in there written by someone unknown that says I have TB, I wish it was— it's not fatal but I wish it was, something to that effect?
>
> MS. ANTHONY: That's correct. It's an October entry.
>
> THE COURT: And you want to show— you want to offer that to show that no matter who it was written by, it was found at the scene and it should have been investigated by the officer?
>
> MS. BOCK: And they wanted to argue that [Victim's] medical records should be obtained, which is an inference that

> it's her handwriting. I mean, it's just inferential hearsay.
>
> THE COURT: Yeah. I—
>
> MS. BOCK:—and they're trying to backdoor it, and they—
>
> THE COURT: Yeah. I'm not—I don't think you can come in the backdoor that way without authentication. Now, if you can authenticate that is her writing in the journal, I may change my mind on this issue. I may. I'll revisit it. I'm not making any promises.

The offer of proof was denied, and Exhibit BBB was excluded.

On appeal, Defendant argues that the address book should have been admitted to support his defense that Victim was accidentally killed when Defendant attempted to prevent her suicide. Defendant reaches this conclusion by pyramiding the following inferences together: (1) the entry about tuberculosis in the address book reflects a desire by the writer to die from a fatal disease; (2) Defendant presented testimony from a witness that, two weeks prior to Victim's death, she told Defendant that she intended to kill herself and make it look like he did it; and (3) Defendant presented sufficient evidence to make a prima facie showing that Victim was the author of the entry in the address book. We conclude that the trial court properly excluded Exhibit BBB due to the absence of any proof that it had been written by Victim.[8]

Whether sufficient foundation has been laid to justify the admission of evidence is a matter for the trial court to determine in the exercise of its the sound discretion. *State v. Zimmerman*, 886

---

8. In so holding, we do not mean to suggest that the trial court would have been obligated to admit the address book if such proof existed and had been presented because there may have been several other legitimate grounds for excluding this exhibit, such as relevancy, remoteness, etc.

S.W.2d 684, 691 (Mo.App.1994). As this Court stated in *Ozark Appraisal Service, Inc. v. Neale*, 67 S.W.3d 759 (Mo.App. 2002), "A number of foundational requirements must be met before a document may be received into evidence, including relevancy, authentication, the best evidence rule and hearsay." *Id.* at 766. Here, the trial court excluded Exhibit BBB because it was not authenticated. "The authenticity of a document cannot be assumed, and what it purports to be must be established by proof." *Estate of West v. Moffatt*, 32 S.W.3d 648, 653 (Mo.App. 2000); *see also Cummins v. Dixon*, 265 S.W.2d 386, 394 (Mo.1954) (as a general rule, the execution or authenticity of a private writing must be established before it may be admitted in evidence). Even if a document purports to have been written and signed by the person to whom it is attributed, that fact, standing alone, is insufficient to establish its authenticity and genuineness. *State v. Davis*, 849 S.W.2d 34, 41 (Mo.App.1993).

Defendant claims he presented sufficient circumstantial evidence to establish the authenticity of the address book as a writing authored by the Victim. We disagree. Initially, we note that Dr. Anderson found no evidence Victim suffered from tuberculosis when he performed her autopsy. Therefore, Defendant's assertion that Victim wrote the disputed entry appears to lack any factual basis. Furthermore, Defendant presented neither lay nor expert testimony tending to prove that the address book was written in Victim's handwriting. The single circumstance linking the address book to Victim is that it was found in her trailer. Standing alone, this circumstance is insufficient to authenticate Exhibit BBB as a document written by Victim. *See Davis*, 849 S.W.2d at 41.

Because a trial court has broad discretion to admit or exclude evidence, we will reverse one of its evidentiary rulings only upon a showing that the trial court clearly abused its discretion. *See State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc 1997). A trial court does not abuse its discretion unless its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *See State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997). We find no such abuse of discretion here. Therefore, we hold that the trial court committed no error in excluding Exhibit BBB from evidence. Defendant's second point is denied.

Finding no error, we affirm the judgment of convictions and sentences entered by the trial court.

PARRISH, J., concurs.

RAHMEYER, C.J., P.J., concurs.