**STATE of Missouri, Respondent,**

v.

**Joseph E. BRAGG, Appellant.**

**Joseph E. BRAGG, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. WD 45346, 46861.**

Missouri Court of Appeals,
Western District.

Dec. 21, 1993.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before BRECKENRIDGE, P.J., and KENNEDY and LOWENSTEIN, JJ.

BRECKENRIDGE, Presiding Judge.

Joseph E. Bragg appeals both his conviction and ten-year sentence following a jury trial for murder in the second degree, § 565.-004, RSMo 1978,[1] and the denial of his Rule 29.15 motion for postconviction relief after an evidentiary hearing. Mr. Bragg raises five points on appeal, alleging error (1) by the trial court in overruling his motions for judgment of acquittal and in sentencing him because the state's evidence was insufficient to support the jury's finding of guilt beyond a reasonable doubt; (2) by the trial court in overruling his objection to the state's closing argument which improperly asserted that Mr. Bragg had made a tacit admission; (3) by the motion court in denying his Rule 29.15 claim that his counsel was ineffective for failing to introduce into evidence a letter from Mr. Bragg to Detective Gonzalez; (4) by the trial court in refusing to submit his Instruction E and in submitting the case to the jury under a verdict director that did not require a finding that Mr. Bragg intentionally and with premeditation and malice aforethought committed the murder; and (5) by the trial court in submitting to the jury Instruction No. 4 which defined reasonable doubt as proof that leaves one "firmly convinced" of the defendant's guilt. The judgments of the trial court and the motion court are affirmed.

In January of 1982, Joseph E. Bragg lived in Kansas City, Missouri with Nancy Grufford, their two daughters, five-year-old Jolene and two-month-old Veronica, and Ms. Grufford's fifteen-year-old daughter, Winona. Veronica, who had been born prematurely, was hospitalized from her birth on November 6, 1981 until December 14, 1981. In January of 1982, however, Veronica was progressing well. Although she was small for her age

---

1. Section 565.004 was repealed in 1983 and the current statute codifying the crime of murder in the second degree is § 565.021, RSMo 1986.

and had suffered respiratory problems at birth due to her prematurity, at the age of two months, Veronica was gaining weight and she no longer had respiratory problems.

On January 10, 1982, Ms. Grufford left for work around 3:00 p.m., leaving Jolene and Veronica in the care of Mr. Bragg. Winona came home from her paper route sometime in the afternoon or early evening.

Ms. Grufford returned from work between midnight and 1:00 a.m. on January 11, 1982. When checking on Veronica, Ms. Grufford noticed she was moaning and groaning and that the infant appeared "lifeless." Ms. Grufford called the baby's doctor, Joe Spurney, M.D., who directed Ms. Grufford to bring Veronica to the emergency room of St. Joseph's Hospital. Ms. Grufford transported Veronica to the hospital in an ambulance.

Medical records indicate that an examination of Veronica at the hospital revealed small bruises to her nose, left ear lobe, and stomach. Veronica was later found to have a torus fracture of the right wrist, edema of the head (swelling of the brain), and a subarachnoid hemorrhage. After being maintained on a life-support system for three and one-half weeks, Veronica died on February 5, 1982.

Mr. Bragg was arrested on January 13, 1982, and was charged on February 5, 1982 with murder in the second degree in connection with Veronica's death. On August 16, 1982, Mr. Bragg, who was free on bond, failed to make a court appearance. A warrant for Mr. Bragg's arrest was issued on August 18, 1982.

In August of 1982, Mr. Bragg left the state of Missouri. From August of 1982 until sometime in 1990, Mr. Bragg lived under his mother's maiden name in Knoxville, Tennessee, with Ms. Grufford, Jolene, and two children born to Mr. Bragg and Ms. Grufford after Veronica's death. In 1990, Mr. Bragg was arrested and returned to Kansas City, Missouri to stand trial.

A jury trial was held in this case. Isaac Rosenberg, M.D., a pediatrician who treated Veronica after her birth and after she was taken to the emergency room on January 11, 1982, and Dr. Bonita Peterson, a former medical examiner for Jackson County, Missouri who performed an autopsy on Veronica, testified that Veronica suffered from "shaken infant syndrome." Dr. Rosenberg explained that shaken infant syndrome results when a child is shaken "so violently that the head jerks back and forth, sort of like a whiplash." The violent shaking causes the veins in and around the child's brain to tear, leading to brain hemorrhaging and swelling. Both Dr. Rosenberg and Dr. Peterson stated that Veronica's injuries and death were caused by having been violently shaken back and forth repeatedly. Drs. Rosenberg and Peterson testified that Veronica's injuries could not have been self-inflicted and were not consistent with being dropped into a bathtub of water.

Ruth Schwenk, the director of social services at St. Joseph's Hospital during the time Veronica was treated there, also testified at the trial. She recounted a meeting she and Dr. Rosenberg had with Mr. Bragg and Ms. Grufford about Veronica's condition. This meeting occurred on January 12, 1982, during Mr. Bragg's one visit to the hospital to see Veronica. Ms. Schwenk described Mr. Bragg as being "pretty uncooperative" during the meeting, refusing to answer questions posed to him and failing to make eye contact with them. When Dr. Rosenberg asked Mr. Bragg what had happened to Veronica, Mr. Bragg stated he was giving the child a bath and dropped her into the tub two times. According to Ms. Schwenk, he also told them that he "sometimes played rough with the child," "throwing it up in the air and catching her." When Dr. Rosenberg and Ms. Schwenk expressed their amazement and asked him if he actually threw Veronica in the air, Mr. Bragg said, "Well, maybe I just bounced it on my knee." Mr. Bragg attributed the bruise on Veronica's nose to his twisting it in play.

Ms. Schwenk stated that when Dr. Rosenberg explained the seriousness of Veronica's condition to Mr. Bragg and Ms. Grufford, "[Mr. Bragg's] only reaction was how soon they could take the baby out of the hospital because it was costing a lots [sic] of money." Mr. Bragg then abruptly left the hospital. Ms. Schwenk testified that Mr. Bragg never

denied during the meeting that he was the sole caretaker of Veronica the night before her admission to the hospital.

Shortly after meeting with Dr. Rosenberg and Ms. Schwenk, Mr. Bragg was interviewed by Detectives Angel A. Gonzales and James Stuckey of the homicide unit of the Kansas City, Missouri police department. At trial, both detectives read into the record police reports detailing statements made by Mr. Bragg during their interviews with him.[2] Mr. Bragg told Detective Gonzales that when Ms. Grufford left for work at approximately 3:00 in the afternoon on January 10, 1982, he stayed home with Veronica, Jolene, and Winona. Mr. Bragg stated that during the course of the evening he fed Veronica and gave her a bath. When asked by the detective if anything unusual happened while he was bathing Veronica, Mr. Bragg replied that "while he was picking up Veronica in the tube [sic], she slipped out of his hands and fell back into the tube [sic]." He could not recall whether the baby fell on her front or on her back. Veronica cried, but Mr. Bragg "otherwise noted nothing unusual."

Detective Stuckey noted that Mr. Bragg was told during his interview that the police were investigating the possible child abuse of Veronica and that "he was the only one that had custody of her during the time the abuse took place." Mr. Bragg told the detective that Veronica was in "good physical condition" when Ms. Grufford left for work on January 10, 1982, and that while she was gone he changed Veronica's diapers numerous times and bathed her in a standard size bathtub. Mr. Bragg stated that except for the time he took Veronica to the bathroom to bathe her, Veronica spent the evening lying on a bed in the bedroom.

When informed that medical personnel at St. Joseph's Hospital believed Veronica would die when removed from the life support system, Mr. Bragg replied that "he would just have to live with that." Detective Stuckey reported that "[d]uring the course of the interrogation Bragg would occasionally laugh at things that were asked of him such

as did he drop the baby and how the baby sustained the injuries and then he would reply that he did not know." Often when Veronica was mentioned, Mr. Bragg would talk about problems he was having with Ms. Grufford "and how she would not do what he said." Detective Stuckey specifically noted Mr. Bragg's behavior during the interview:

After continually denying—continuously denying any knowledge about how the baby sustained the injuries and repeating this numerous times, Bragg would hang his head down towards the table, leave it there for a short period of time and then again repeat that he would tell us how the baby was injured, but it would be a lie. When Bragg would raise his head back to his normal position, if a question was asked about the child abuse, he would then chuckle out loud and start talking about the victim's mother Nancy Grufford.

Mr. Bragg took the stand at his trial and testified in his own defense. He stated that he did not cause Veronica's injuries and that he did not know who was responsible for her injuries. He testified that he cared for Veronica when he was at home that afternoon and evening and that he did not notice anything wrong with her while he was taking care of her. Mr. Bragg attested that he had briefly left Veronica alone with Jolene and Winona on three occasions on the night of January 10, 1982, but that he did not hear or notice anything unusual about the baby when he returned home on each occasion. Mr. Bragg did, however, remember Winona telling him at one point during the evening that she heard Veronica moaning and groaning. Mr. Bragg told Winona not to worry about it, noting that once Veronica's arms were lifted out from underneath the blankets "that seemed to ease it." Mr. Bragg then testified that he left for a fourth time to go jump start Ms. Grufford's car when she got off work and when they returned to the house Ms. Grufford noticed that Veronica was moaning and groaning and appeared "lifeless."

The trial court overruled Mr. Bragg's motions for judgment of acquittal at the close of

---

2. Prior to each interview, Mr. Bragg was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the state's evidence and at the close of all the evidence. The trial court also overruled Mr. Bragg's counsel's objection to the assertion of the state made during closing argument that Mr. Bragg did not deny being the sole caretaker of Veronica when Ms. Schwenk and Detective Stuckey talked to Mr. Bragg about how the baby was injured. The jury found Mr. Bragg guilty of murder in the second degree and assessed his punishment at ten years imprisonment. The trial court ordered that Mr. Bragg be committed to the custody of the Missouri Department of Corrections and Human Resources for a period of ten years.

Mr. Bragg filed a notice of appeal. Thereafter, Mr. Bragg filed a pro se Rule 29.15 motion seeking to set aside his conviction and sentence. Appointed counsel filed an amended Rule 29.15 motion on Mr. Bragg's behalf which alleged in part that Mr. Bragg's trial attorney was ineffective for failing to introduce into evidence a letter that Mr. Bragg had written to Detective Gonzales shortly after Veronica's death. In the letter, Mr. Bragg had asked the detective to investigate further, maintaining that either Winona or Jolene caused Veronica's death.

An evidentiary hearing on Mr. Bragg's motion was held. At the hearing, Mr. Bragg's trial counsel testified that he had intended to introduce the letter into evidence to show that other people were in the house at the time Veronica was injured, but once he had established through other testimony that Winona and Jolene were also in the house, he forgot about the letter.

The motion court overruled Mr. Bragg's Rule 29.15 motion, finding that Mr. Bragg adduced no proof that the failure to introduce the letter deprived him of a substantial right or altered the outcome of the trial. Furthermore, the motion court maintained that the substance of the letter ("encouraging law enforcement to view his daughter and step-daughter as suspects") was otherwise brought out at trial through Mr. Bragg's statements to one of the detectives, his statements to Ms. Schwenk, and his own trial testimony.

Mr. Bragg filed a notice of appeal of the denial of his Rule 29.15 motion. Mr. Bragg's appeal from the underlying judgment and his appeal from the denial of his postconviction motion have been consolidated into this single appeal. Rule 29.15(*l*).

## I.

As his first point on appeal, Mr. Bragg contends that the trial court erred in overruling his motions for judgment of acquittal at the close of the state's evidence and at the close of all the evidence and in sentencing him on his conviction for second-degree murder. Mr. Bragg maintains that the state's evidence was insufficient to support the jury's finding of guilt beyond a reasonable doubt. Mr. Bragg argues that the evidence was entirely circumstantial, failed to prove that Veronica's injuries and death were caused by him, and failed to exclude "every reasonable hypothesis" of his innocence.

■ Mr. Bragg presented evidence in his own behalf after the state rested its case, thereby waiving any claim of error in the trial court's ruling on his motion for judgment of acquittal at the close of the state's evidence. *State v. Purlee,* 839 S.W.2d 584, 587 (Mo. banc 1992). This court must focus its review on whether Mr. Bragg's motion for judgment of acquittal at the close of all the evidence should have been granted. *Id.*

■ When considering whether the evidence is sufficient to support a criminal conviction, this court views the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the verdict, rejecting all contrary evidence and inferences. *Id.* This court neither reweighs the evidence nor determines the reliability of that evidence or the credibility of witnesses. *State v. Neal,* 849 S.W.2d 250, 253 (Mo.App. 1993). Rather, an appellate court's review is limited to determining "whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Purlee,* 839 S.W.2d at 587.

■ Recently the Missouri Supreme Court found that this same standard of review applies to cases based on circumstantial evidence. *State v. Grim,* 854 S.W.2d 403, 406–

07 (Mo. banc 1993). Before *Grim*, in circumstantial evidence cases the facts and circumstances establishing guilt had to be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of the defendant's innocence. *Id.* at 405. Rejecting the circumstantial evidence rule as a standard for reviewing the evidence, the Supreme Court in *Grim* concluded that there was no longer a need for a different rule for reviewing convictions based on circumstantial evidence because "[a]ny societal distrust of circumstantial evidence has long been abandoned." *Id.* at 406. Even where evidence of a defendant's guilt is solely circumstantial, the evidence is sufficient to support a conviction if the evidence is such that a reasonable juror would be convinced beyond a reasonable doubt of the defendant's guilt. *Id.* at 406, 408.

■ Viewed in the light most favorable to the verdict, the evidence at trial established that although born prematurely, Veronica was healthy when she left the hospital on December 14, 1981, and was healthy and uninjured when left in Mr. Bragg's care at approximately 3:00 p.m. on January 10, 1982. Approximately ten hours later, Ms. Grufford returned home from work to find Veronica moaning and groaning and appearing "lifeless." Veronica was immediately taken to the emergency room of St. Joseph's Hospital, where she was found to be suffering from a broken wrist, bruises to her nose, left ear, and stomach, and a brain injury consistent with having been violently and repeatedly shaken back and forth. She died February 5, 1982, as a result of the brain injury.

Although Winona and Jolene were also in the home during the time Mr. Bragg was caring for Veronica, in his statements to the police and hospital personnel on January 12, 1982, Mr. Bragg never indicated that during the evening of January 10, 1982, either girl had the ability or opportunity to seriously injure Veronica without being detected by him. Nor did he indicate that Veronica had been left in the care of either of the girls during the evening. He told Detective Stuckey that except for the time he was bathing Veronica, she spent the entire evening lying on a bed in the bedroom.

While Mr. Bragg testified at trial that he left the house four times during January 10th, leaving Veronica alone with Winona and Jolene for about thirty minutes at a time, the jury was free to disbelieve this testimony. *Neal,* 849 S.W.2d at 253. Moreover, Mr. Bragg admitted that he did not find Veronica to be in any distress when he returned from the first three of his errands. He testified that Ms. Grufford discovered Veronica to be in distress within fifteen minutes of his return from picking up Ms. Grufford and her car at work. His inference that Veronica was injured during his last absence from the house is contradicted by his own testimony that Winona heard Veronica moaning and groaning at some time earlier in the evening. He further conceded that Jolene was too small to inflict the injuries Veronica sustained and that he had never known Winona to demonstrate any emotional problems or exhibit any violent tendencies towards him or anyone else.

Mr. Bragg did not go with Ms. Grufford to take Veronica to the hospital. He did not visit Veronica at the hospital until the second day that she was hospitalized. While at the hospital, Mr. Bragg seemed inappropriately focused on the cost of Veronica's hospitalization rather than her condition. When questioned by hospital personnel and two police detectives about the origin of Veronica's injuries, Mr. Bragg was uncooperative and evasive. According to Ms. Schwenk, the only explanation he had for the baby's injuries was that he dropped the baby "he thought two times" while bathing her. Both Dr. Rosenberg and Dr. Peterson, however, testified that Veronica's injuries could not have been caused by being dropped in a bathtub of water. When proven false, exculpatory statements evince a consciousness of guilt. *State v. Rodden,* 728 S.W.2d 212, 219 (Mo. banc 1987). When asked about the bruise on Veronica's nose, Mr. Bragg told Detective Gonzales that he would playfully squeeze and wiggle the noses of all the children and that "he guessed he would sometimes play a little rough with the kids."

■ Mr. Bragg admitted leaving the state of Missouri before he could be tried for Veronica's death and living under an as-

sumed name while outside the state. Both flight and the use of an alias demonstrate a consciousness of guilt. *State v. Plant,* 694 S.W.2d 751, 755 (Mo.App.1985).

This court believes that a reasonable juror could be convinced of Mr. Bragg's guilt beyond a reasonable doubt. The evidence produced at trial was sufficient to support Mr. Bragg's conviction. The trial court properly denied Mr. Bragg's motion for judgment of acquittal at the close of all the evidence. Point one is denied.

## II.

Mr. Bragg argues as his second point on appeal that the trial court erred in overruling his objection to a comment made by the assistant prosecuting attorney during the state's closing argument. Mr. Bragg contends that by stating that Mr. Bragg had not denied being the sole caretaker of Veronica at the time she sustained the injuries resulting in her death, the prosecutor improperly asserted that Mr. Bragg had made a tacit admission. Mr. Bragg claims he was prejudiced by the argument.

During the state's case-in-chief, Ms. Schwenk was asked by the assistant prosecuting attorney, "At any time, did [Mr. Bragg] ever deny that he was the sole caretaker of the child the night before her admission to the hospital?" Ms. Schwenk responded, "No." Detective Stuckey, also testifying for the state, read a report he wrote detailing his conversation with Mr. Bragg into the record. The report included the following excerpt:

> Bragg was again told ... that we were investigating child abuse of his daughter Veronica Bragg and *that he was ... the only one that had custody of her during the time this abuse took place.* Bragg stated that the child was in good physical condition when Nancy Grufford left for work on 1–10–82 and that during the course of the time, he changed the baby's diapers numerous times and also bathe (sic) the child in a standard size bathtub in the residence of the house. When asked how the baby could have sustained a broken arm, a whiplash, bruises to the stomach, bruises ... on the nose and a bruise

to the right ear and the head behind the right ear, he stated he did not know, that nothing unusual happened while he was watching the child. When asked where the child was—was at during the course of the time that he was caring for it, he stated it was lying on the bed in the bedroom except for the time that he took the child to the bathroom to bathe it.

(Emphasis added). Counsel for Mr. Bragg did not object to the question posed to Ms. Schwenk, to her answer, or to Detective Stuckey's testimony. During the state's closing argument, the assistant prosecuting attorney, Ms. Roseanne Smith, referred to the testimony of Ms. Schwenk and Detective Stuckey over the objections of Mr. Bragg's trial counsel:

> MS. SMITH: First of all, the mother left at 3:00 p.m. that afternoon when she went to work. The baby was fine. Veronica was fine. Second, the defendant ... was the sole care taker [sic]. Now he told—when the social worker Ruth Schwenk confronted him about being the sole caretaker, he didn't deny it.
>
> MR. BRAGG'S ATTORNEY: Your Honor, I'll object to that. That's not the testimony.
>
> THE COURT: Jury will recall the evidence.
>
> MS. SMITH: And whenever Detective Stuckey asked him about the sole caretaker, he didn't deny it.
>
> MR. BRAGG'S ATTORNEY: Your Honor, could I approach the bench?

Out of the hearing of the jury, Mr. Bragg's trial counsel objected to the statements that Mr. Bragg did not deny being Veronica's sole caretaker on the basis that the state was improperly asserting that Mr. Bragg had made a tacit admission. The trial court overruled the objection.

 Mr. Bragg did not preserve for appellate review his challenge to the reference to Ms. Schwenk. Mr. Bragg claims that the state improperly asserted that he made a tacit admission by its argument that he failed to deny he was the sole caretaker of Veronica when confronted by Ms. Schwenk. The only timely objection Mr. Bragg made to this

argument was that it did not conform to the evidence. The trial court appropriately responded that the "jury will recall the evidence." Therefore, any review of the claimed error regarding Mr. Bragg's failure to deny that he was the sole caretaker to Ms. Schwenk is only for plain error. *State v. Lopez*, 836 S.W.2d 28, 34 (Mo.App.1992).

A determination of whether Mr. Bragg's reactions to the statements of Ms. Schwenk and Detective Stuckey qualify as tacit admissions is not necessary for the disposition of this point. The point argued by the state was not that Mr. Bragg's reactions were tacit admissions that he was the sole caretaker of Veronica, but rather that if he had really left Veronica with Winona and Jolene for four thirty-minute periods during the evening, he would have included that information when he was recounting the events of October 10th to Ms. Schwenk and Detective Stuckey. The state may comment upon a defendant's failure to give an explanation for statements made by a defendant concerning the circumstances surrounding the commission of a crime, when defendant's silence is pre-arrest. *See Lopez*, 836 S.W.2d at 34–35. In the case at bar, the state in its closing argument could properly comment on Mr. Bragg's failure to report exculpatory information when he recounted his version of the happenings on the night Veronica was injured. *See Id.*

Even after an arrest, when a defendant waives his right to remain silent and makes statements to police concerning the offense about which the defendant is being questioned, it is proper for the state to comment in closing argument on questions the defendant would not answer and statements the defendant did not make. *State v. Pulis*, 822 S.W.2d 541, 546 (Mo.App.1992); *State v. Frentzel*, 717 S.W.2d 862, 866 (Mo.App.1986).

The trial court is given broad discretion to control closing argument. *State v. Martin*, 852 S.W.2d 844 (Mo.App.1992). Trial courts commit no error by permitting the state to review properly admissible evidence in argument before the jury after the evidence is in the record. *State v. Williams*, 369 S.W.2d 408, 417 (Mo. banc 1963); *State v.*

*Knighton*, 518 S.W.2d 674, 680 (Mo.App. 1975). Attorneys are allowed wide latitude in making closing argument, such that "counsel may state opinions or conclusions that fairly draw from the evidence, and counsel may draw any inference from the evidence that he believes is justified in good faith." *Martin*, 852 S.W.2d at 853.

When the state's comments are reviewed in the context of the entire argument, it is clear that the state was emphasizing the flaws in Mr. Bragg's version of the events of the night and the lack of credibility in his account, *Lopez*, 836 S.W.2d at 34, rather than asserting that Mr. Bragg made any tacit admissions. The trial court did not abuse its discretion in allowing the assistant prosecutor's comments. Point two is denied.

### III.

As his third point on appeal, Mr. Bragg maintains that the motion court erred in denying his Rule 29.15 motion for postconviction relief. Mr. Bragg claims he was denied his right to effective assistance of counsel and to due process of law because his trial counsel, in failing to introduce into evidence a letter Mr. Bragg wrote to Detective Gonzales in March of 1982, did not exercise the customary skill and diligence that a reasonably competent attorney would have exercised under the same or similar circumstances.

The letter Mr. Bragg sent to Detective Gonzales reads as follows:

Detective A. Gonzales

Someone told me you would at least listen and do something to investigate my case and find which of those girls caused my daughters (sic) death. Please. I (sic) been through the worst ordeal of my life losing my daughter and then because of; well I still love the family and went thru jail and a hospital in hopes that one of them would speak up. Please investigate further. Talk to Nancy, she knows I didn't do it, the kids are scared and haven't spoken up yet. Please, I can't take any more. Although I love them being charged like this scares the hell out of me. Never have I been in trouble and never intend to but you must do more to find I'm

innocent. Please, please do something to help me. I haven't the heart to approach them. Can't stand the thought of the hurt I'd have knowing who did it. Please do your job. Can't bear this burden; not mine. Please find out which one did it. Nancy knows I didn't but she's protecting her kids.

Joe Bragg

Detective Gonzales received this letter March 29, 1982, several weeks after Mr. Bragg's discussions with hospital and police officials, his arrest, and Veronica's death. Neither the testimony of Ms. Schwenk nor the reports of Detectives Gonzales and Stuckey indicate that Mr. Bragg had accused Winona or Jolene of injuring Veronica prior to doing so in this letter.

Mr. Bragg's trial counsel did not introduce Mr. Bragg's letter into evidence at the trial. At the July 24, 1992, evidentiary hearing, Mr. Bragg's trial counsel revealed that part of his trial strategy was to "raise the fact that there were other people who had opportunity to cause injury to the victim," acknowledging that "[a]s far as actually pointing the finger at anybody in particular, we weren't able to do that." He stated that he had intended to introduce the letter into evidence as "one possible way" of showing that other people were in the house at the time Veronica was injured, but once he had established through other testimony that Winona and Jolene were also in the house, he forgot about the letter. Mr. Bragg argues that he was prejudiced by his attorney's failure to introduce this letter because he was denied the opportunity to rebut the state's argument that he had never mentioned Winona as a suspect prior to trial.

■■■■ This court's review of the motion court's denial of Mr. Bragg's Rule 29.15 motion is limited to a determination of whether the motion court's findings of fact and conclusions of law are "clearly erroneous." *Leisure v. State,* 828 S.W.2d 872, 873–74 (Mo. banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992); *State v. Davis,* 849 S.W.2d 34, 45 (Mo.App.1993); Rule 29.15(j). The findings and conclusions of the motion court are clearly erroneous "only if, after review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made." *Leisure,* 828 S.W.2d at 874.

■■■■ In order to successfully prove ineffective assistance of counsel, a movant must show both (1) that his or her attorney was deficient in that the attorney did not exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances; and (2) that the movant was prejudiced by his or her counsel's deficiency. *Id.* (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) and *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987)); *Davis,* 849 S.W.2d at 45. The movant bears a heavy burden and must overcome the presumption that the conduct of the movant's attorney was proper. *Leisure,* 828 S.W.2d at 874. "To demonstrate prejudice, a movant must establish that there is a reasonable probability that, but for counsel's actions, the result of the trial would have been different." *Id.* at 875. A reasonable probability exists when the likelihood of a different result is sufficient to undermine confidence in the trial's outcome. *Id.; State v. Foster,* 854 S.W.2d 1, 8 (Mo.App.1993).

To prevail on his ineffective assistance of counsel charge, Mr. Bragg must prove both prongs of the *Strickland* test. *Amrine v. State,* 785 S.W.2d 531, 534 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990). This court will not address the performance prong of the *Strickland* test, however, because Mr. Bragg has not demonstrated prejudice in that he has not shown that the outcome of the trial would have been any different had his attorney attempted to introduce the letter into evidence.

Mr. Bragg claims the letter would have rebutted the state's argument that his account of his absences from the home on January 10, 1982, and his accusation of Winona were recent fabrications. Mr. Bragg directs this court's attention to the assistant prosecutor's cross-examination, during which she questioned Mr. Bragg as to whether he had previously told anyone, including Ms. Schwenk, the doctors at St. Joseph's, or De-

tectives Gonzales and Stuckey, that he had left Veronica in the care of Winona and Jolene four times the night before Veronica was taken to the emergency room. When Mr. Bragg alleged he had told this to hospital and police officials, the assistant prosecutor asked him why none of them mentioned this fact in their reports. Mr. Bragg also notes in his brief that during closing argument the state urged that Mr. Bragg's claim that Winona and Jolene were alone with the baby for four thirty-minute periods was a recent fabrication. Although he claims that the state argued that he had "recently fabricated the possibility that Winona Grufford injured Veronica," he fails to direct this court to the place in the transcript where the state specifically made this assertion. The only support this court can find for Mr. Bragg's claim that the state argued that Mr. Bragg's accusation of Winona was only recent is in the state's closing argument:

Winona, she was there, but that is all that we know about that. Now why doesn't the defendant mention Winona ten years ago when all this is being brought up to him, when his own flesh and blood looks like this. Because Winona is still around, and she's talking to the police.

Despite Mr. Bragg's claims to the contrary, a review of the entire record indicates that even if the letter had been admissible, its introduction into evidence would not have altered the outcome of the trial. The letter does not mention that Mr. Bragg left the house four times on January 10, 1982, leaving Veronica alone with Winona and Jolene for thirty minutes at a time, and does not explain why Mr. Bragg's absences and accusations are not noted by Ms. Schwenk and Detectives Gonzales and Stuckey. Furthermore, even though the letter does support the claim that the accusations contained in the letter were not recently made, Mr. Bragg's testimony at trial contradicts his written allegations. Although he stated in the letter to Detective Gonzales that either Winona or Jolene was responsible for Veronica's death, at trial Mr. Bragg conceded that Jolene was too small to inflict the injuries Veronica sustained and that he had never known Winona to demonstrate any emotional problems or exhibit any violent tendencies

towards him or anyone else. He further admitted that he did not find Veronica to be in any distress when he returned from his various errands.

Mr. Bragg cannot show that, but for his counsel's failure to introduce the letter into evidence, there is a reasonable probability that the jury would not have found him guilty. Because Mr. Bragg cannot demonstrate prejudice, this court concludes that the motion court's denial of his Rule 29.15 motion was not clearly erroneous. Point three is denied.

## IV.

Mr. Bragg claims as his fourth point on appeal that the trial court erred in refusing his offered Instruction E and in submitting the case to the jury under the verdict director, Instruction No. 5. Mr. Bragg argues that Instruction No. 5 did not require the jury to find beyond a reasonable doubt the existence of all of the elements of murder in the second degree, § 565.004, RSMo 1978, because it did not require a finding that he caused the death of Veronica "intentionally, premeditatedly, and with malice aforethought."

Instruction No. 5, which required the jury to find that Mr. Bragg "intended to cause serious bodily harm" to Veronica, accurately tracked MAI–CR2d 15.14, the pattern instruction for second-degree murder, § 565.-004, RSMo 1978. Because this was the applicable instruction provided by MAI–CR, the trial court was required to give Instruction No. 5 "as written," *State v. Olds*, 831 S.W.2d 713, 721 (Mo.App.1992), to the exclusion of any other instruction. *State v. Middleton*, 854 S.W.2d 504, 517 (Mo.App.1993), Rule 28.-02(c). Moreover, the Missouri Supreme Court and the eastern and southern districts of the Missouri Court of Appeals have repeatedly rejected Mr. Bragg's argument that MAI–CR2d 15.14 (and its predecessor MAI–CR 6.06) fail to require a jury finding of the existence of all the elements of second-degree murder. *State v. Brown*, 547 S.W.2d 797, 805 (Mo. banc 1977); *State v. Jackson*, 496 S.W.2d 1, 2 (Mo. banc), *cert. denied*, 414 U.S. 1115, 94 S.Ct. 847, 38 L.Ed.2d 742 (1973) (holding that the jurors, in finding that the defendant *intended* to cause the death of the victim, "*necessarily* and *unavoidably* be-

lieved and found that the homicide 'was done feloniously, willfully, premeditatedly, and with malice aforethought' " (emphasis in original)); *State v. Ramsey,* 665 S.W.2d 72, 74 (Mo.App.1984); *State v. Stoer,* 553 S.W.2d 484, 484–85 (Mo.App.1977); *State v. Graham,* 527 S.W.2d 722, 723–24 (Mo.App.1975). This court, too, must follow the last controlling decision of the Missouri Supreme Court. *State v. Weems,* 800 S.W.2d 54, 58 (Mo.App. 1990). Point four is denied.

## V.

As his fifth and final point on appeal, Mr. Bragg contends that the trial court erred in submitting to the jury Instruction No. 4, patterned after MAI–CR3d 302.04. Mr. Bragg alleges that in defining proof beyond a reasonable doubt as proof that leaves the jurors "firmly convinced of the defendant's guilt," Instruction No. 4 diminished the meaning of reasonable doubt, allowing the jury to convict him based on a quantum of proof that was less than "beyond a reasonable doubt," and thereby violating his right to due process of law.

Mr. Bragg asserts that the reasonable doubt definition contained in MAI–CR3d 302.04 resembles the definition of reasonable doubt contained in a Louisiana jury instruction that the United States Supreme Court found unconstitutional in *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The Missouri Supreme Court, however, has consistently rejected Mr. Bragg's argument. *See State v. Debler,* 856 S.W.2d 641, 652 (Mo. banc 1993); *State v. Griffin,* 848 S.W.2d 464, 469 (Mo. banc 1993); *State v. Ervin,* 835 S.W.2d 905, 924 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Blankenship,* 830 S.W.2d 1, 13 (Mo. banc 1992). This court must follow the Missouri Supreme Court's last controlling decision. *Weems,* 800 S.W.2d at 58. Point five is denied.

The judgments of the trial and motion courts are affirmed.

All concur.