**STATE of Missouri, Plaintiff–Respondent,**

v.

**Stephen Mark JAMES, Defendant–Appellant.**

No. 28789.

Missouri Court of Appeals, Southern District, Division I.

Oct. 31, 2008.

David L. Mills, Rolla, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Judge.

In 2004, Stephen James (Defendant) was charged by information with murder in the first degree and armed criminal action for killing Michael McCurdy (Victim) by shooting him four times. *See* §§ 565.021, 571.015.[1] Following a jury trial, Defendant was convicted of the lesser-included offense of murder in the second degree and armed criminal action, for which he was sentenced to concurrent terms of imprisonment for 30 and 10 years, respectively.

On appeal, Defendant presents three points. He contends that the trial court erred in: (1) overruling his motion to suppress certain evidence at trial because the affidavit to support the initial warrant contained information discovered during an earlier, warrantless search of Defendant's residence; (2) denying Defendant's request for an involuntary manslaughter jury instruction based on testimony from a witness that Defendant said the shooting was accidental; and (3) denying Defendant's request for self-defense instructions based upon the 2007 statutory amendments to § 563.031.2(2) and § 563.011 RSMo Cum.Supp. (2007), which permit the use of deadly force against a person who remains after unlawfully entering a dwelling.[2] Finding no merit to any of Defendant's contentions, this Court affirms.

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. On appeal, this Court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and rejects all contrary evidence and inferences. *State v. Newberry,* 157 S.W.3d 387, 390 (Mo.App.2005); *State v. Cravens,* 132 S.W.3d 919, 921 (Mo. App.2004). Viewed from that perspective, the favorable evidence supporting the State's case against Defendant is summarized below.

Defendant and Victim had known each other in junior high school. In November 2003, the two men became reacquainted. Defendant lived in a home on V Highway near Rolla. Victim, who was on medication for schizophrenia, began periodically staying with Defendant. In February 2004, Victim met Melanie Donlinger (Donlinger) and started staying with her at her

---

1. All references to statutes are to RSMo (2000) unless otherwise specified.

2. The parties generally refer to these new amendments as the "castle doctrine."

apartment. Sometime in March 2004, Donlinger was evicted. Defendant agreed to let both of them stay at his house.

On April 2, 2004 (the Friday before Easter), Defendant left Rolla to attend a family function in St. Louis. Defendant asked a friend, Sonya Richardson (Richardson), to feed and water Defendant's dog and to keep an eye on the house. Victim did not like Richardson. When she went to Defendant's house, Victim started screaming at her that she had no right to be there and that he would call the police if she did not leave. When Richardson came over the next evening to check on the dog, she and Donlinger decided to go out. Victim, who did not want Donlinger to leave with Richardson, tried to put sugar in the gas tank of Richardson's van so the vehicle would break down. Richardson ended up leaving without Donlinger.

The next afternoon, Richardson gave Donlinger a ride to her parents' house. During that trip, Donlinger told Richardson that Victim had put sugar in the van's gas tank. After checking the tank, they discovered that the sugar had not actually made it into the gasoline supply. Richardson called Defendant and told him what had happened. Defendant got upset and said he was going to his house.

Some time later, Richardson arrived at Defendant's house in a borrowed maroon minivan. Defendant, who was outside, said he was leaving because he had been assaulted by Victim. Richardson told Defendant that either Victim or Donlinger had called Defendant a snitch, which caused Defendant to become angry. He went back into his house and started breaking things and yelling, which led to a physical fight between Defendant and Victim.

After that altercation, everyone went outside. Victim and Donlinger got into her van to leave, but they were unable to do so because the van had a flat tire. Victim and Donlinger then got out of the van. Another fight broke out. Defendant picked up Donlinger and slammed her to the ground head first. Both Victim and Donlinger punched Richardson in the face, which knocked out some of her teeth. Victim and Defendant continued to fight until Victim poured gasoline on the hood of Defendant's car. Defendant got in his car and drove away. Richardson followed in the maroon van. As Defendant was leaving, he told Victim and Donlinger to get out of the house by morning.

Joyce Kennedy (Kennedy) was Victim's mother. She arrived shortly after Defendant and Richardson departed. Kennedy found her son standing, bent over, next to a tree near the front of the house. Victim said that he was hurting and that he needed to get out of there because Defendant had threatened to kill him and burn the house down with him and Donlinger in it if they did not leave. Kennedy and Victim went into the house. While Victim spoke with friend Robert Blake (Blake) on the phone, Kennedy cleaned up the glass on the floor from the earlier altercations. Victim said Defendant was going to kill him and asked Blake for a tire for the van. Victim also asked Blake for a gun, which he refused to provide. After the call concluded, Victim told Kennedy that Blake was going bring items to fix the van first thing in the morning. Victim asked Kennedy if she would bring Victim a gun that he could use for protection.

After Defendant and Richardson left Defendant's house, they drove to a parking lot. Defendant left his car and got into the maroon van. Richardson drove Defendant to a friend's house trailer. During that trip, Defendant called what Victim had done "bullshit" and said he had taken it "too far." Defendant went into the trailer and came back out with his SKS rifle.

Defendant said: (1) he was going to get Victim off of his property; (2) if necessary, Defendant would kill Victim; (3) Defendant would kill Donlinger if she did not like it; and (4) he would kill Richardson if she did not go along with it. Defendant also put some gasoline into jugs. He said that if he had to kill Victim, Defendant would burn down the house with Victim in it.

Richardson and Defendant then went to a restaurant where they met an acquaintance of Defendant named Robert Fultz (Fultz). Defendant, who was distraught, said he "had words" with Victim and had asked him and his girlfriend to leave. Fultz invited Defendant and Richardson to stay at Fultz's trailer, which they did.

Sometime between 4:00 a.m. and 4:30 a.m. on April 5, 2004, Defendant asked Fultz if Richardson could stay at the trailer while Defendant went to his house to see whether Victim and Donlinger had left. Defendant asked Fultz and Richardson to come to Defendant's house and check on him if he had not returned by daylight.

Defendant took the maroon van and parked about one-quarter to one-half mile away from his house. He walked to the house with the SKS rifle, which was equipped with a bayonet and had a flashlight taped to it. Donlinger was in bed with Victim when she was awakened by a gunshot. She saw Defendant standing at the bedroom doorway, holding the rifle. She turned her face away and covered up because she expected to be shot. She felt Victim get up and heard another shot. Victim said, "I'm bleeding; I'm going to die. I'm bleeding." Defendant replied, "You're not bleeding that bad, you pussy." Donlinger heard two more shots, and Defendant yelled at Victim to change his pants because he "smelled like shit." Defendant then jumped up on the bed and stabbed at Donlinger with the bayonet,

cutting her arm. Defendant threatened to kill Donlinger, her son and other members of her family. This tirade continued for about 15 minutes.

Meanwhile, Fultz and Richardson arrived at the house. Richardson saw no cars in the driveway, so she walked around the outside of the house. When she knocked on the side of the house, Defendant looked out the window. Defendant gave Richardson the van keys and asked her to go get the vehicle. Fultz drove Richardson to where the van was parked and then left.

When Richardson returned and entered Defendant's house, she saw Donlinger sitting on the living room couch. Defendant was holding the rifle in his hands. Donlinger was shaking and saying that she was going to die. When Richardson asked Defendant why Donlinger was going to die, Defendant responded, "[Victim] got it in his belly." Richardson went into the bedroom and saw Victim's body on the floor.

Over the next few hours, Defendant and Richardson discussed what was going to happen. Defendant repeatedly threatened to kill Donlinger. Donlinger was taken into the bedroom where Victim had been killed. Defendant and Richardson went into the living room, where Defendant set down the rifle. Once Donlinger was alone, she dove out of the bedroom window and ran toward Highway V. As soon as Defendant and Richardson realized Donlinger was gone, they ran out of the house and followed in the maroon van.

Once Donlinger reached Highway V, she tried to flag down a car driven by Joy Campbell (Campbell). Campbell drove off without letting Donlinger in the car. Campbell saw Defendant exit his driveway in the maroon van, cross the road and stop the vehicle. Defendant and Richardson

pulled Donlinger into the van and drove away. Campbell called the police from a neighbor's house.

The Phelps County Sheriff's Department dispatched officers to the scene in response to Campbell's call. The officers knew Defendant, so they decided to go to his house. It was very near the site of the abduction that Campbell reported, and officers had received information that a male had chased a female up Defendant's driveway toward his house. The officers wanted to see if they could obtain any information about the maroon van or abduction. When they reached the house, they observed broken windows and an open front door. After walking around the house and calling for Defendant with no response, the officers approached the open door. They observed that the inside of the house was in disarray. A chair had been overturned, and other items were strewn about on the ground. Because the condition of the house suggested that a struggle had taken place, the officers decided to enter and conduct a protective sweep to check for anyone who might be in danger. The officers found Victim's dead body in the back bedroom. There was a modified SKS rifle on the living room couch. The officers backed out of the house, secured the scene and obtained a search warrant. During the subsequent search of the house, officers found three shell casings. A bullet jacket was located near the body and the bed, and a bullet was lodged in the bedroom floor near the back wall.

After Donlinger had been pulled into the van, Richardson drove toward a nearby industrial park. They drove back to Defendant's house, but the police were already there. Richardson then drove into a wooded area, where the van got stuck. They walked to the home of Steve Sullivan (Sullivan), who was a friend of Defendant. He told Sullivan about shooting Victim.

Sullivan agreed to give them a place to stay if Defendant agreed to call a lawyer and turn himself in the next morning. Defendant and the two women each took showers and then talked about what happened. Defendant coached the women to tell the police that Defendant had only shot Victim after he got up to attack Defendant. He would not surrender unless he knew what Richardson and Donlinger would tell police about the shooting.

The next morning, Defendant and the two women went to a lawyer's office. They spoke to an attorney, and the police were called. Defendant was wearing clothing covered in what appeared to be dried blood. He did not appear to have any fresh injuries, and he told police that he needed no medical treatment.

Tests performed on the bayonet, the van seats and Defendant's jeans were positive for human blood. An analysis of the blood on the bayonet revealed that it was consistent with Donlinger's genetic profile.

An autopsy was performed on Victim's body. He had been shot four times. There was one bullet wound in his abdomen, two in his chest and one in the back of his left thigh. The bullet which inflicted this last wound had moved upward into Victim's midsection. All of the shots were fired from Victim's left. The wounds to the abdomen and chest were fatal because the bullets damaged Victim's liver, right kidney, left lung and aorta.

After a jury trial, Defendant was convicted of second-degree murder and armed criminal action. This appeal followed. Additional facts necessary to the disposition of the case are included below as we address Defendant's three points of error.

### Point I

■ Prior to trial, defense counsel filed a motion to suppress all evidence seized at

Defendant's house, which included Victim's body and the SKS rifle. Defendant argued that the challenged evidence was the result of an unlawful search and seizure because the affidavit to support the initial warrant contained information discovered during an earlier, warrantless search of Defendant's residence. The motion was denied following an evidentiary hearing. At trial, Defendant claimed that he shot Victim in self-defense. In opening statement, the first thing that defense counsel told the jury was that Defendant "shot and killed [Victim] when [Victim] attacked [Defendant] in [Defendant's] house in April of 2004." During Defendant's case-in-chief, he testified that he shot Victim in self-defense as Victim attempted to wrestle the gun away from Defendant and kill him.

In Defendant's first point, he contends the trial court erred in denying the motion to suppress because "the affidavit contains information discovered during a warrantless search of [Defendant's] residence and, in the absence of said information, no probable cause was established for the search warrant to issue ...." Defendant does not challenge the admission of any evidence presented at trial or explain how he was prejudiced thereby.

■ Defendant's point is fatally defective because the only ruling it challenges is the denial of the motion to suppress. *State v. Lloyd,* 205 S.W.3d 893, 900 (Mo. App.2006); *State v. Shifkowski,* 57 S.W.3d 309, 316 (Mo.App.2001). This is because the actual ruling subject to challenge is the admission of the evidence during the trial itself. *See State v. Wolf,* 91 S.W.3d 636, 642 (Mo.App.2002). Defendant's point and argument ignores the fact that he claimed self-defense and presented testimony to support that theory at trial. It is settled law that reversal of a criminal conviction is not required if a federal constitutional error is harmless beyond a reasonable doubt.

*Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Lopez,* 128 S.W.3d 195, 201 (Mo.App.2004). Assuming *arguendo* that the trial court's ruling on the motion to suppress was erroneous, the admission of the evidence the police collected at Defendant's home was harmless beyond a reasonable doubt because Defendant admitted during the trial that he used the SKS rifle to kill Victim inside that dwelling. The discovery of the body, rifle, shell casings, bullet fragments and other evidence was completely consistent with Defendant's own trial testimony that he killed Victim in self-defense. *See State v. Rutter,* 93 S.W.3d 714, 723 n. 3 (Mo. banc 2002) (because defendant conceded that he shot the victim, any error as to the admissibility of the evidence seized during a warrantless search, including the victim's body and a nearby pistol, was not prejudicial); *State v. Cook,* 67 S.W.3d 718, 723–24 (Mo.App.2002) (assuming the trial court erred in denying defendant's motion to suppress his statements to police about shooting the victim, the error was harmless beyond a reasonable doubt because defendant's trial testimony tracked what the statements to police revealed). Point I is denied.

### Point II

■ In Defendant's second point, he contends the trial court erred in refusing to submit an involuntary manslaughter instruction to the jury. In reviewing this point, the evidence must be viewed in a light most favorable to Defendant. *State v. Newberry,* 157 S.W.3d 387, 393 (Mo.App. 2005). So viewed, the following evidence was adduced at trial.

During the State's case-in-chief, Sullivan was called as a witness and gave the following testimony:

And then the whole time [Defendant] was crying, I'm trying to get him to tell

me what happened. And he said it was an accident, the guy stabbed him. He said it was a struggle with the gun and somehow the guy got the gun from [Defendant] and stabbed him in the side. [Defendant] was wearing his leather jacket and he showed me where the knife, or whatever it was that went in the jacket, to the side right there. And I said, "Did you shoot the man?" And he said, "It was an accident." It was a struggle over the gun after the guy stabbed him. I guess the gun somehow just—he said it just went off.

During Defendant's case-in-chief, he testified on his own behalf and gave the following testimony: Victim was a violent and unstable person. On one occasion, Defendant had seen Victim argue with a man and then throw him down a steep flight of stairs. On another occasion, Victim had attacked an innocent bystander because Victim was angry at Donlinger. Victim had to promise to take his schizophrenia medication and stay off of methamphetamine before he was allowed to stay with Defendant. After Victim and Donlinger started living with Defendant, however, he became aware that they were using methamphetamine.

Defendant stored his SKS rifle at his friend's trailer because Defendant was afraid Victim would steal it. On the evening of April 4, Defendant obtained the SKS rifle before returning to his home. Defendant did so because he was afraid he would be attacked by Victim. He brought the rifle for his own protection. Defendant had taped a flashlight to the rifle so he could see in the dark. Before entering the house, Defendant extended the rifle's bayonet.

When Defendant walked into his house, he heard Victim and Donlinger laughing in the bedroom. Defendant walked to his bedroom, stood inside the doorway at the foot of the bed and told Victim to get out of the house. Defendant did not point his rifle at Victim. Defendant told Victim not to be there when Defendant got back because "I'm bringing the law with me." As Defendant turned around and left the room, Victim yelled "You're dead now!" He attacked Defendant from behind and jumped on his back. Defendant fell face-down to the floor with the rifle directly underneath him. The gun strap was over his right shoulder and the rifle was angled down towards the left. Victim hit Defendant at the base of his skull. Victim then grabbed the rifle. He had one hand on the barrel and the other hand on the bayonet. Defendant was afraid that he would lose the rifle to Victim and be shot, so Defendant "cycled a round into the chamber" and then "clicked the safety off and . . . pulled the trigger." Victim's hand came off the bayonet, and he looked down at his hand and his body. Still gripping the barrel with his other hand, he fell on one side. Defendant then pulled the trigger a few more times.

Defendant also denied that he told Sullivan the shooting was an accident. Instead, Defendant said he didn't mean for it to happen or want to kill Victim:

Q. And what did you tell [Sullivan]; do you remember?

A. That there was an altercation and [Victim] ended up shot and that I didn't mean for it to happen. I didn't mean for—I didn't want to kill [Victim].

Q. Did you tell [Sullivan], though, that it was an accident?

A. No, I did not. I told him I didn't want it to happen. He might have perceived that as me saying it was an accident, but did I say that this was an accident? No. I said I didn't want this to happen. And to the best of my

ability at the time, I tried to explain to him what did happen.

At the jury instruction conference, Defendant tendered a verdict-directing instruction on involuntary manslaughter in the first degree and asked the court to submit the instruction to the jury based on Sullivan's testimony the Defendant told him "this was an accident." The State objected because Defendant had testified that the shooting was not accidental, and Sullivan's testimony would not support the instruction either. The court refused to submit the instruction.

On appeal, Defendant contends this ruling was in error. He argues that, based upon Sullivan's testimony, the jury could have found that Defendant acted recklessly in killing Victim.[3] This Court disagrees.

 Involuntary manslaughter is a lesser-included offense of second-degree murder. *See* § 565.025.2(2)(b). A defendant is not entitled to an involuntary manslaughter instruction unless it is supported by the evidence and any logical inferences derived therefrom. *State v. Newberry,* 157 S.W.3d 387, 393 (Mo.App.2005). A trial court is not required to instruct on a lesser-included offense if the evidence provides no basis for the jury to convict the defendant of that offense. *See Rhodes v. State,* 157 S.W.3d 309, 312 (Mo.App.2005).

A person commits the crime of first-degree involuntary manslaughter if he "[r]ecklessly causes the death of another person ...." § 565.024.1(1). A person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise

in the situation." § 562.016.4. Sullivan's testimony provides no evidentiary basis from which a reasonable juror could conclude that Victim's death resulted from any reckless action by Defendant. Accepting what Sullivan said as true, Victim and Defendant were struggling over the rifle. Victim got the gun from Defendant and stabbed him in the side. Victim and Defendant then struggled further over the gun, and Victim was shot when the gun went off. Thus, Defendant was involved in a life-and-death struggle with an assailant who had already attempted to kill Defendant by stabbing him with the weapon's bayonet. Defendant continued fighting and struggling with Victim to avoid death or additional injury when the gun went off. Under these circumstances, no reasonable juror could conclude that Defendant's actions to protect himself from further injury constituted a gross deviation from the standard of care which a reasonable person would exercise in that situation. In short, Sullivan's testimony provides no factual basis from which any reasonable inference of recklessness can be drawn. *Cf., e.g., State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005) (defendant's actions were reckless when he "was showing off a gun and waving it around" when it discharged, hitting victim in the head). Because Defendant's tendered involuntary manslaughter instruction was not supported by the evidence, the trial court did not err in refusing to submit that instruction. Point II is denied.

*Point III*

 Defendant's third point also involves alleged instructional error. The trial was conducted in September 2007. During the instruction conference, Defendant

---

**3.** Defendant acknowledges that his own trial testimony would not support the giving of his tendered instruction, but he argues that the jury could have disbelieved Defendant and chosen to believe Sullivan instead.

tendered a self-defense instruction patterned after MAI–CR 3d 306.06.[4] The court agreed to give this instruction, which became Instruction No. 9. Defendant also tendered two not-in-MAI self-defense instructions that were marked as Instructions H and I. These alternative instructions were based upon 2007 statutory amendments to § 563.031 and § 563.011. *See* 2007 Mo. Laws 816–17. The former statute was amended by broadening the permissible use of deadly force to include the use of such force against "a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter a dwelling, residence, or vehicle lawfully occupied by such person." *Id.* at 817; § 563.031.2(2) RSMo Cum.Supp. (2007). The latter statute was amended to provide new definitions for the terms "[r]emain after unlawfully entering" and "[u]nlawfully enter." 2007 Mo. Laws 816–17; § 563.011(6),(8) RSMo Cum.Supp. (2007). These statutory amendments did not become effective until August 28, 2007. 2007 Mo. Laws vii. The State objected to Instructions H and I because the 2007 amendments did not apply to a 2004 occurrence. The trial court refused these instructions and gave Instruction No. 9.

Defendant contends the trial court erred in refusing to give Instructions H and I because the 2007 amendments to § 563.031.2 and § 563.011 should have been applied retroactively. Defendant argues that these amendments are procedural in nature because they merely change "how the State presents evidence to meet its burden." This Court disagrees.

In April 2004, Missouri's substantive law on justification in criminal cases was contained in Chapter 563 RSMo (2000). Sections 563.011 and 563.031 each contained component parts of that substantive law. Chapter definitions were set out in § 563.011. The substantive provisions defining the parameters of the allowable use of force in defense of persons were set out in § 563.031. The pattern jury instructions in MAI–CR 3d Chapter 306 were based upon these substantive statutes. *See, e.g.,* Notes on Use 1, MAI–CR 3d 306.06 (identifying § 563.031 as the supporting law upon which the instruction was based); *see also State v. Goodine,* 196 S.W.3d 607, 618–22 (Mo.App.2006) (determining whether MAI–CR 3d 306.06 properly tracked the substantive law of self-defense contained in § 563.031); *State v. Beck,* 167 S.W.3d 767, 778–88 (Mo.App. 2005) (same discussion).

The amendments to § 563.011 and § 563.031 occurred while Defendant's prosecution was pending. These amendments created new substantive elements that expanded the permissible scope of the use of force in defense of persons. As a consequence of these amendments, our Supreme Court has promulgated new jury instructions that set out the ultimate facts jurors must find in order for this new substantive law to be applied in criminal cases. *See* MAI–CR 3d 306.06A, MAI–CR 3d 306.07A, MAI–CR 3d 306.08A and MAI–CR 3d 306.11.

■ Substantive changes to criminal laws are not applied retroactively. *See State v. Smith,* 988 S.W.2d 71, 82 (Mo.App. 1999) (any crime that is committed prior to the amendment of a penal law is unaffected by the amendment); *State v. Gillespie,* 944 S.W.2d 268, 271 (Mo.App.1997) (same holding). This principle of law is articulated in § 1.160, which states in pertinent part:

---

**4.** This pattern instruction is based upon § 563.031.2 RSMo (2000), which authorizes the use of deadly force in self-defense if such force was necessary for a person to "protect himself or another against death, serious physical injury, rape, sodomy or kidnapping or serious physical injury through robbery, burglary, or arson." *Id.*

No offense committed and no fine, penalty or forfeiture incurred, or prosecution commenced or pending previous to or at the time when any statutory provision is repealed or amended, shall be affected by the repeal or amendment, but the trial and punishment of all such offenses, and the recovery of fines, penalties or forfeitures shall be had, in all respects, as if the provision had not been repealed or amended, except: (1) That all such proceedings shall be conducted according to existing procedural laws[.]

*Id.*[5] Therefore, the substantive law of justification in effect in April 2004 applied to Defendant's prosecution. The trial court properly refused proposed Instructions H and I because they were based upon statutory amendments to the substantive law of justification that did not take effect until 2007. Point III is denied.

The judgment of the trial court is affirmed.

BARNEY, J., and SCOTT, P.J., concur.

---

**5.** In 2005, this statute was itself amended to repeal subsection (2), but that change has no bearing on the issue under consideration here.