

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI,                  )
                                    )
    Plaintiff-Respondent,       )
                                    )
v.                                  )    No. SD36859
                                    )    Filed: March 30, 2022
NIKIA BARNUM,                       )
                                    )
    Defendant-Appellant.        )

### APPEAL FROM THE CIRCUIT COURT OF LAWRENCE COUNTY

Honorable Mark Stephens, Special Judge

### **AFFIRMED**

Nikia Barnum (Defendant) was charged by information with committing the following offenses in December 2016: the class A felony of trafficking in the first degree in violation of § 195.222 (Count 1); the class D felony of resisting arrest in violation of § 575.150 (Count 2); the class C felony of possession of Adderall, a controlled substance, in violation of § 195.202 (Count 3); and the class A misdemeanor of possession of drug paraphernalia in violation of § 195.233 (Count 4).[1]

---

[1] All statutory references are to RSMo Noncum. Supp. (2014). Effective January 1, 2017, the provisions of §§ 195.202, .222 and .233 were extensively rewritten and transferred to §§ 579.015, .065 and .074, respectively.

Defendant waived a jury trial, and he did not testify or present any evidence. After hearing all of the evidence and arguments, the trial court found Defendant guilty on all four counts. The court sentenced Defendant to 15 years' imprisonment for trafficking in the first degree; two years for felony resisting arrest; five years for possession of a controlled substance; and 90 days in county jail (with credit for time served) for misdemeanor possession of drug paraphernalia. The sentences were concurrent, except for Defendant's sentence for felony resisting arrest. That sentence was to be served consecutively to the sentences imposed on the other counts. This appeal followed.

Defendant presents two points for decision. Point 1 challenges the sufficiency of the evidence on the resisting-arrest count. Point 2 challenges the denial of a motion to suppress. Finding no merit in either point, we affirm. For ease of analysis, we will review the points in reverse order.

*Point 2*

In Point 2, Defendant challenges the denial of his motion to suppress evidence and the admission of that evidence at trial.[2] The basis for Defendant's objection was that the highway patrol troopers he encountered did not have "reasonable suspicion that criminal activity was afoot" when they seized him. According to Defendant, this means all of the evidence recovered after the seizure should have been excluded. The motion to suppress

---

[2] A point challenging only the denial of a motion to suppress is fatally defective because the actual ruling subject to challenge is the admission of the evidence at trial. *State v. James*, 267 S.W.3d 832, 837 (Mo. App. 2008). In a jury-tried case, the objection(s) in the motion to suppress must be made when the evidence is offered at trial and carried forward in the motion for new trial to be preserved for appellate review. *See State v. Nunez*, 455 S.W.3d 529, 530 (Mo. App. 2015). In a bench-tried case like this one, renewing the objection(s) at trial is sufficient. *See State v. Abercrombie*, 229 S.W.3d 188, 192 (Mo. App. 2007).

was denied after the court conducted an evidentiary hearing.  At trial, Defendant's objection was renewed, and additional evidence relevant to this issue was presented.

An appellate court reviews the trial court's denial of a motion to suppress in the light most favorable to that ruling, and we defer to the trial court's credibility determinations. *State v. Rice*, 573 S.W.3d 53, 66 (Mo. banc 2019).  We will not reverse unless the trial court's ruling on the motion to suppress was clearly erroneous.  *State v. Holman*, 502 S.W.3d 621, 624 (Mo. banc 2016).  Clear error exists only if, after reviewing the entire record, an appellate court is left with the definite and firm belief a mistake has been made. *Id*.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, "protects the right of citizens to be free from unreasonable searches and seizures[.]" *State v. Lovelady*, 432 S.W.3d 187, 190 (Mo. banc 2014).  "Warrantless seizures are generally unreasonable and, therefore, unconstitutional, unless an exception applies." *Id*. at 191; *State v. Smith*, 448 S.W.3d 835, 840 (Mo. App. 2014).  One such exception involves the so-called *Terry* stop.  *See Terry v. Ohio*, 392 U.S. 1 (1968); *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005).  Pursuant to this exception, an officer may conduct a brief investigatory stop when he or she has a reasonable suspicion, based upon specific and articulable facts, that illegal activity has occurred or is occurring.  *Pike*, 162 S.W.3d at 472.  Another exception to the warrant requirement is an arrest based upon probable cause.  *See State v. Wykert*, 639 S.W.3d 547 (Mo. App. 2022); *State v. Ganaway*, 624 S.W.3d 361, 366 (Mo. App. 2021).

On appeal, "determinations of reasonable suspicion and probable cause are reviewed *de novo*." *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011) (internal quotation marks and citation omitted).  We consider the evidence presented to the trial court at the hearing

on the motion to suppress and the evidence presented at trial to determine whether there is sufficient evidence in the record to support the trial court's ruling. ***State v. Hughes***, 563 S.W.3d 119, 124 (Mo. banc 2018). We have applied these principles in summarizing the evidence presented.

On December 9, 2016, the Missouri Highway Patrol conducted a "ruse drug checkpoint" operation on I-44 near Exit 33 in Lawrence County. Sergeant Gary Braden (Sergeant Braden) and Sergeant James Musche (Sergeant Musche) were involved in the operation. Signs were placed on the inner and outer shoulders of the eastbound lanes of I-44 that said: "Drug Checkpoint Ahead, K9 in Use." There was no actual drug checkpoint being conducted.

The signs were placed relatively close to Exit 33. This particular exit was chosen because there were no gas stations, convenience stores or restaurants nearby, and the abutting road, Lawrence County Road 1010 (Road 1010), was surrounded by "basically farm country" and provided access only to a few residences. Sergeant Braden described what happened if a driver took Exit 33:

> On that day, they were observed. We would have an unmarked, plainclothes officer, unmarked vehicle and a plainclothes officer sitting on the shoulder of the exit. He would observe how the – how the vehicle exited the interstate. Then he would observe and watch for any violations the vehicle might have committed. And we're in contact with him via radio the entire time. And he would call out a vehicle, the make, model, color, sometimes the registration if he could see it, of the vehicle that was exiting and then he would watch for any violations and call those out if they committed one.

Before reaching Exit 33, eastbound drivers would have passed by a "big Kum & Go gas station, convenience store [and] Subway restaurant" located at the top of the ramp at Exit 29 in Sarcoxie.

4

At 2:15 p.m., the trooper sitting on the shoulder of Exit 33 called out a gray Toyota Corolla (the Corolla) with a Texas license plate. The trooper said that the Corolla "was in the left lane and abruptly changed lanes and took the exit kind of at the last second." No traffic violation was observed. The Corolla went to the top of the ramp and turned south on Road 1010. There were only farms and residences in that direction on Road 1010. There was nothing on Road 1010 that would cause a driver to believe there was either a gas station or business at which one could ask for directions. Sergeant Braden checked the plates via computer and determined that the Corolla was a Hertz rental car from Texas. Sergeant Braden followed the Corolla.

The Corolla traveled less than one-quarter of a mile and turned into the first residence on the west side of Road 1010. Sergeants Braden and Musche were familiar with that residence because a felony narcotics arrest had been made in the driveway the previous day. Based on that event, Sergeant Braden knew the people who lived there would not be at home. As Sergeant Braden drove by the residence, he saw Defendant, who was the driver, and a female passenger, later identified as Kimberly Shanks (Shanks), get out of the Corolla.[3] Defendant and Shanks "hurried" to the front door of the residence and knocked on the door. Sergeant Braden pulled into the next driveway south of the residence. Sergeant Musche, in plainclothes and an unmarked vehicle, pulled in behind Sergeant Braden.

Sergeant Braden decided to make consensual contact with the occupants of the Corolla. Because the occupants were not the homeowners and their vehicle was a rental from Texas, the troopers needed to "check to see if they needed any assistance or what the

---

[3] Another female passenger with the last name of Garza remained in the vehicle.

circumstances were that they were at that residence." The troopers then pulled their vehicles into the driveway behind the Corolla, exited and approached Defendant and Shanks.

After the troopers identified themselves as investigators, Defendant abruptly placed both of his hands in the dark leather coat he was wearing. When asked about the nature of their trip, Defendant said he and his passengers were returning to Michigan from Oklahoma City after having been there for four or five days. Defendant identified himself with a Michigan driver's license. According to Sergeant Musche, "Oklahoma City and Tulsa are some of the largest methamphetamine hubs in the Midwest," and travel from Oklahoma City or Texas to Michigan would be consistent with moving methamphetamine.[4]

Defendant said that he was looking for a gas station. Sergeant Musche then asked Defendant why he didn't stop at Sarcoxie, but Defendant "didn't provide a plausible answer." During that entire conversation, Defendant paused before answering each question.

The troopers also noticed a large bulge under Defendant's coat, in the upper chest area. When asked what was in his coat, Defendant produced a prescription pill bottle out of his left coat pocket and showed it to Sergeant Musche. The bottle contained several pills and was labeled with a prescription for Adderall.[5] The Adderall prescription was for a person named Timothy Shanks. At that point, Sergeant Musche knew: (1) this medication

---

[4] Sergeant Musche also testified that I-44 is "a known drug corridor" and that "drugs flow from the southwest and west coast of this country through Missouri on Interstate 44 to points north and east of here."

[5] Adderall is a combination of four amphetamine salts: "dextroamphetamine saccharate, dextroamphetamine sulfate, amphetamine aspartate, and amphetamine sulfate." *Adderall: 7 things you should know*, http://drugs.com/tips/Adderall-patient-tips (last visited Mar. 29, 2022). Amphetamine salts are a Schedule II controlled substance in Missouri. *See* § 195.017.4(3)(a); § 195.202.

had not been prescribed for Defendant; (2) the bottle contained a number of pills; and (3) Adderall was a Schedule II controlled substance. Defendant claimed that the bottle belonged to Shanks' son, although he was not present in the Corolla.

Sergeant Musche became concerned that the large bulge under Defendant's coat might be a concealed weapon. When Sergeant Musche reached out to touch the large bulge to make sure Defendant did not have weapon, Defendant fled. Sergeant Musche pursued Defendant for about 40 feet and tackled him near a barbed wire fence. Sergeant Musche yelled repeatedly: "Stop resisting. Stop resisting. Show me your hands." Defendant "turtled up" with his hands under his body. After a prolonged struggle that "seemed like forever[,]" Sergeants Musche and Braden forced Defendant's hands behind his back and into handcuffs. As Defendant got to his feet, he attempted to run again. Sergeant Musche had to use a leg sweep to put Defendant back on the ground. Defendant was kept on the ground until he stopped resisting.

After Defendant was placed in custody, the pill bottle was recovered from the ground where Defendant had first started running. A search of Defendant's coat revealed that he was carrying two nylon eyeglass cases, collectively containing five plastic baggies with approximately 70 grams of a white crystal substance inside them. That substance field tested positive for methamphetamine. A search of the Corolla revealed a glass smoking pipe wrapped in a paper towel in the console. Later lab tests confirmed that the methamphetamine weighed over 63 grams. The pill bottle contained 41 capsules of Adderall, which tested positive for amphetamine.

Sergeant Musche advised Defendant of his *Miranda* rights.[6]  Defendant did not invoke those rights and agreed to speak with the troopers.  Defendant told them that he had obtained the methamphetamine from a friend in Oklahoma for payment for a debt on a construction job that he had done.  Defendant also admitted to smoking methamphetamine earlier that day and apologized for his behavior multiple times.

Defendant's second point contends all of the evidence recovered upon Defendant's arrest should have been excluded as fruit of an illegal search or seizure.  According to Defendant, the arresting troopers lacked reasonable suspicion of criminal activity when they blocked Defendant's vehicle in the driveway.  Defendant's contention is based upon *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).  Defendant argues that the ruse drug checkpoint which culminated in his arrest was unconstitutional, so no reasonable suspicion could arise thereafter.  We disagree.

In *Edmond*, the United States Supreme Court disallowed the use of evidence obtained through the use of drug checkpoints, absent "some quantum of individualized suspicion" of wrongdoing.  *Id*. at 47.  For the following reasons, Defendant's reliance on *Edmond* is misplaced.

In *State v. Mack*, 66 S.W.3d 706 (Mo. banc 2002), a city police department set up a drug checkpoint at an exit on Highway 61 in Lincoln County.  The exit was selected because it did not provide motorists with gas or food services, and the only reason a motorist would take the exit was to go to a high school, a church, or one of several residences in the area.  There were no activities that night at the high school or church.  The police set up signs on the highway approximately one-quarter mile from the exit stating:  "DRUG

---

[6]  *See **Miranda v. Arizona***, 384 U.S. 436 (1966).

ENFORCEMENT CHECKPOINT ONE MILE AHEAD" and "POLICE DRUG DOGS WORKING[.]" These signs were intended to make drivers believe the drug checkpoint was at the next exit. Uniformed officers were stationed at the top of the ramp and stopped all exiting vehicles. The officers recorded the driver's license number and registration and asked why the driver took this exit. Officers were to look for any signs of possible drug trafficking, and they were given discretion to interview the driver and passengers separately if they thought it was necessary. If officers did not find suspicious circumstances that warranted reasonable suspicion of drug trafficking, they released the vehicle and its occupants. If circumstances did raise reasonable suspicion, the officers asked the driver for permission to search the car. If the driver granted permission, he or she was asked to sign a permission-to-search form, and the officers then searched the vehicle. If permission was not granted, officers used a drug dog to sniff the exterior of the vehicle, and if the dog indicated the presence of a controlled substance, the vehicle would be searched on that basis instead. *Id*. at 707. As the defendant approached the Highway 61 exit, his vehicle appeared to be continuing past the off ramp. "[S]uddenly it shot over and almost missing it came up the off ramp. And he was moving a pretty good pace too." *Id*. Defendant was stopped, and police discovered various narcotics and drug paraphernalia during a consensual search of the vehicle. *Id*. at 708.

After the defendant was charged, he filed a motion to suppress that cited ***Edmond*** as support for the motion. The trial court granted the motion, and the State appealed. *Id*. at 708. After the appeal was transferred to our Supreme Court, the Court stated that the issue presented was "whether the deceptive drug checkpoint scheme does indeed generate the necessary quantum of individualized suspicion." *Id*. at 709. After reviewing the detailed

9

procedures used by the police, our Supreme Court distinguished ***Edmond*** and held that the ruse drug checkpoint was "fundamentally different than that in *Edmond* because the required 'quantum of individualized suspicion' is present." ***Mack***, 66 S.W.3d at 709-10. In so holding, our Supreme Court noted that a defendant's particular conduct in exiting before the checkpoint must be considered:

> According to the officer's testimony, defendant "suddenly veered off onto the off ramp" and "almost missed the turn," as if he made the decision to exit only upon learning that a checkpoint was supposedly ahead. This evidence, when coupled with the deceptive checkpoint scheme, certainly compels a finding of "individualized suspicion."

***Id***. at 710.

In the case at bar, the procedures of the ruse drug checkpoint, coupled with Defendant's conduct of abruptly changing lanes and taking Exit 33 at the last second, meets the standard for individualized suspicion required by ***Edmond*** and ***Mack***.

Assuming *arguendo* that ***Mack*** is not controlling, our decision would not change. Defendant's contention that the troopers lacked reasonable suspicion when they parked behind the Corolla ignores favorable testimony that the initial encounter was consensual. As we explained in ***State v. Long***, 599 S.W.3d 908 (Mo. App. 2020):

> Generally, there are three categories of police-citizen encounters: (1) a consensual encounter; (2) an investigative detention requiring only reasonable suspicion based upon specific articulable facts; and (3) an arrest requiring probable cause. *See Johnson*, 427 S.W.3d at 872. "A consensual encounter does not implicate the Fourth Amendment until the officer restrains the individual's liberty to the extent that a reasonable person would feel that he or she was not free to leave or decline the officer's questions." *Id*. If the encounter is consensual, "police officers are free to question an individual, even without reasonable suspicion of criminal activity[.]" *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007); *see also Lammers*, 479 S.W.3d at 631 ("for purposes of the Fourth Amendment, a seizure does not occur simply because a police officer approaches an individual and asks a few questions"). Further, "[u]nder the Fourth Amendment, a law enforcement officer may approach a vehicle for safety reasons, or if a motorist needs assistance, so

10

long as the officer can point to reasonable, articulable facts upon which to base his actions." *State v. Schroeder*, 330 S.W.3d 468, 473 (Mo. banc 2011); *see State v. Galen*, 554 S.W.3d 550, 554 (Mo. App. E.D. 2018).

*Long*, 599 S.W.3d at 914.

When Defendant parked the Corolla in the driveway of the first residence on the west side of Road 1010, Sergeant Braden knew the people who lived there were not at home. He and Sergeant Musche pulled into the next driveway south of the residence. Sergeant Braden saw Defendant and Shanks approach the residence and knock on the front door. Because they were not the homeowners and their vehicle was a rental from Texas, Sergeant Braden wanted to "check to see if they needed any assistance or what the circumstances were that they were at that residence." The troopers decided to make consensual contact with the occupants of the Corolla. It was then that they pulled their vehicles into the driveway behind the Corolla, exited, and approached Defendant and Shanks. Based on this evidence, the initial encounter was consensual. *See id*. The troopers pointed out specific, articulable facts on which to base their actions in approaching Defendant and asking him a few questions. *See id*.

During this encounter, the troopers observed unusual conduct leading them to reasonably suspect criminal activity was afoot. *See **Lovelady***, 432 S.W.3d at 191. Reasonable suspicion, which is less stringent than probable cause, is present "if the officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." ***Id***. (internal quotation marks and citation omitted); *see, e.g.*, ***State v. Peery***, 303 S.W.3d 150, 154-55 (Mo. App. 2010) (officer has reasonable suspicion to conduct a detention when he can point to specific facts and inferences which establish an objective basis for suspecting illegal activity).

11

After the troopers identified themselves, Defendant abruptly placed both of his hands in the dark leather coat he was wearing. Defendant said he and his passengers were returning to Michigan from Oklahoma City. Defendant identified himself with a Michigan driver's license. Sergeant Musche knew that Oklahoma City and Tulsa were two of the largest methamphetamine hubs in the Midwest, and travel from Oklahoma City or Texas to Michigan would be consistent with moving methamphetamine. Defendant's explanation for stopping at the residence was suspicious. He said he was looking for a gas station, but he had no explanation for why he had not stopped at one a few miles back. Defendant also paused before answering each question during that conversation.

Thereafter, additional events that occurred during the encounter provided probable cause to arrest Defendant. There was a large bulge in the upper chest area of Defendant's coat. When asked about what was in his coat, Defendant showed the pill bottle to Sergeant Musche. The label of that bottle said it contained Adderall, which is a Schedule II controlled substance. Sergeant Musche observed that the pills had not been prescribed for Defendant. At that point, the troopers had probable cause to arrest Defendant for possession of a controlled substance.

Based on our review of the record, the trial court's decision to deny Defendant's motion to suppress was not clearly erroneous. Accordingly, Point 2 is denied.

*Point 1*

In Defendant's first point, he contends there was insufficient evidence to support his conviction for felony resisting arrest. According to Defendant, there was no evidence that he was being arrested for a felony at the time he fled.

12

On appeal, sufficiency of the evidence is reviewed on the merits, regardless of whether that issue was raised at trial. ***State v. Claycomb***, 470 S.W.3d 358, 361-62 (Mo. banc 2015). In a court-tried criminal case, the judge's findings have the force and effect of a jury verdict. Rule 27.01(b); ***State v. Crawford***, 68 S.W.3d 406, 408 (Mo. banc 2002).[7] The standard used to review the sufficiency of the evidence in a court-tried or a jury-tried criminal case is therefore the same. ***State v. Lauer***, 955 S.W.2d 23, 24-25 (Mo. App. 1997). "Appellate review of sufficiency of the evidence is limited to whether the State has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." ***State v. Hunt***, 451 S.W.3d 251, 257 (Mo. banc 2014). In reviewing the evidence, we accept as true all evidence and inferences favorable to the State; all contrary evidence and inferences are disregarded. ***Crawford***, 68 S.W.3d at 407-08.

The resisting-arrest charge in Count 2 of the information alleged, in relevant part, that Defendant was being arrested "for the felony possession of a controlled substance[.]" At trial, the court took judicial notice of the evidence presented at the evidentiary hearing on the motion to suppress by agreement of the parties. In our earlier discussion of Point 2, we summarized all of the favorable evidence, from the suppression hearing and the trial, relating to the resisting-arrest charge.

A person commits the offense of resisting arrest, in violation of § 575.150.1, if that person: (1) knew or reasonably should have known that a law enforcement officer was making an arrest; (2) resisted that arrest by using or threatening to use violence or physical force, or by fleeing from the officer; and (3) did so for the purpose of preventing the officer

---

[7] All rule references are to Missouri Court Rules (2021).

from completing the arrest. ***State v. Pierce***, 433 S.W.3d 424, 434 (Mo. banc 2014). There is no argument by Defendant that the State failed to prove these three elements.

The offense of resisting arrest can be either a felony or a misdemeanor. ***State v. Johnson***, 613 S.W.3d 517, 520 (Mo. App. 2020). In § 575.150.5(1), the grade of offense is enhanced from a misdemeanor to a felony if the person is "[r]esisting ... an arrest ... for a ... [f]elony[.]" ***Id***. Defendant's argument focuses solely on this enhancement element. The proof requirements for a felony conviction were articulated in ***State v. Shaw***, 592 S.W.3d 354 (Mo. banc 2019):

> Section 575.150.5(1) enhances resisting arrest to a felony when law enforcement makes an arrest "for a felony." In light of the plain meaning of the term "for" set out above and the fact that all felonies are criminal offenses, the State must present sufficient evidence to support a factual finding beyond a reasonable doubt the defendant was arrested "because of" or "on account of" an offense to support a conviction of felony resisting arrest. *See Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding "any fact that increases the penalty for a crime ... must be submitted to [the factfinder], and proved beyond a reasonable doubt"). But whether the offense for which the defendant was arrested is actually a criminal offense that constitutes a felony under Missouri law is purely a question of law, which is up to the courts, not the factfinder, to determine.

***Shaw***, 592 S.W.3d at 359-60. Our Supreme Court also noted:

> even if the record contains evidence that could support a finding that the defendant was arrested for multiple offenses, some of which may not necessarily constitute felonies as a matter of law, an appellate court is bound by the standard of review to affirm a conviction of felony resisting arrest[] because the record contains evidence to support a finding beyond a reasonable doubt that a law enforcement officer arrested the defendant "on account of" or "because of" an offense that constitutes a felony as a matter of law.

***Id***. at 365. Thus, in the case at bar, we must decide whether the State presented sufficient evidence to support a factual finding, beyond a reasonable doubt, that Defendant was arrested because of, or on account of, an offense that constitutes a felony as a matter of law.

14

The Defendant challenges his conviction by arguing that there was insufficient evidence to show that he was being arrested for a felony when he fled. We disagree. Before Defendant fled, he had already produced the prescription pill bottle from his coat pocket and shown it to Sergeant Musche. The trooper observed that the label of the pill bottle said it contained Adderall, which had been prescribed to Timothy Shanks. At that time, Sergeant Musche knew: (1) Adderall is a Schedule II controlled substance in Missouri; (2) the medication had not been prescribed for Defendant; and (3) he was in possession of that controlled substance. Possession of a controlled substance is a class C felony. *See* § 195.017.4(3)(a); § 195.202. Therefore, Defendant was being arrested because of, or on account of, an offense that constituted a felony as a matter of law. *See **Shaw***, 592 S.W.3d at 365. Point 1 is denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

GARY W. LYNCH, C.J. – CONCUR

WILLIAM W. FRANCIS, JR., P.J. – CONCUR

15